COMMONWEALTH *vs.* SIEGFRIED GOLSTON.

Suffolk.    May 3, 1977. — August 26, 1977.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, & LIACOS, JJ.

*Homicide. Death. Proximate Cause. Evidence,* Opinion: expert, Cross-examination; Judicial discretion. *Practice, Criminal,* Charge to jury, Fair trial, Continuance, Examination of jurors.

At the trial for the murder of a man hit on the head with a baseball bat, the mortal wound necessitating removal of a large portion of his skull, the use of an artificial respirator, which twice was removed without the victim's attempting to breathe, and the use twice of an electroencephalogram, which did not reveal any brain activity, following which the respirator was finally removed seven days after the assault and the victim's heart stopped, the judge, accepting the definition of death as "cessation of life" or "ceasing to exist," rightly charged the jury that "as a matter of law, the occurrence of a brain death . . . satisfies the essential element . . . of murder . . . of the death of the victim. Brain death occurs when . . . there has been a total and irreversible cessation of spontaneous brain functions and further attempts at resuscitation or continued supportive maintenance would not be successful in restoring such functions"; conviction of the defendant of murder in the first degree was supported by answers of the jury that the element of death was satisfied by the proof of a brain death and that the brain death of the victim occurred before the artificial life support was disconnected. [251-255]

This court announced that it will feel free to reexamine the justification for the rule that "to constitute criminal homicide the victim of the assault must die within a year and a day from the time of the infliction of the mortal wound." [255]

Any error in the submission to the jury of the issue of the "brain death" of the victim of a mortal assault who was dead on the date an artificial respirator was finally disconnected by a doctor seven days after the assault was harmless beyond a reasonable doubt where the same evidence would have been considered on the issue whether the doctor's conduct was an independent supervening cause of death, and the outcome of the trial, conviction of the defendant of murder in the first degree, would have been the same. [256-257]

At the trial for the murder of a man hit on the head who suffered a "brain death" prior to removal of an artificial respirator, there was no abuse of discretion in the admission of opinion testimony by doctors who were not neurologists [257]; an expert witness was properly allowed to answer a question to be determined by the jury

[257]; the scope of cross-examination of expert witnesses was properly restricted [258]; a harmless answer of a defense expert on cross-examination did not prejudice the defendant [258]; and medical testimony as to the general acceptance of the "brain death" standard was directly relevant [258].

At the trial for the murder of a white man in Dorchester by a black man, there was no abuse of discretion in the denial of the defendant's motion for a continuance because "Boston had been plagued by racial violence" [258-259]; the defendant's motion to dismiss the venire because it contained only four blacks out of sixty persons was properly denied [259]; and there was no abuse of discretion in the judge's overruling the defendant's challenge for cause, and finding indifferent, a prospective white juror with respect to whom a peremptory challenge was exercised by the defendant, who later exhausted all such challenges [259].

At a murder trial, testimony from a Commonwealth witness as to the sound made by the defendant's blow to the victim's head was properly admitted. [259]

Evidence at a murder trial, including evidence of the great and unusual violence with which the victim was struck a single blow in the head by the defendant, who said he did it "For kicks," disclosed no error in the submission to the jury of the issue of murder in the first degree committed with extreme atrocity or cruelty. [259-260]

Upon appeal from a conviction of murder in the first degree of a victim hit on the head with a single blow of a baseball bat, there was no merit in the defendant's contention that he did not intend to kill or to inflict serious bodily harm. [260]

At a murder trial, there was no error in the submission of special questions to the jury not tending to lead the jurors step by step to a verdict of guilty. [260-261]

INDICTMENT found and returned in the Superior Court on December 11, 1975.

The case was tried before *McLaughlin,* C.J.

*John P. White, Jr.* (*Joseph H. Walsh* with him) for the defendant.

*Thomas J. Mundy, Jr.,* Assistant District Attorney for the Suffolk District (*Daniel Engelstein,* Assistant District Attorney, with him) for the Commonwealth.

*Thomas E. Finnerty,* District Attorney for the Plymouth District, amicus curiae, & *Richard M. Lane,* Assistant District Attorney, submitted a brief.

BRAUCHER, J. The defendant appeals his conviction of murder in the first degree. Among numerous other errors, he claims that the death of the victim was not properly established. We hold that the trial judge correctly ac-

cepted the medical concept of "brain death"; alternatively, any error in this respect was harmless beyond a reasonable doubt. We also overrule the defendant's other assignments of error, and we affirm his conviction.

There was evidence of the following facts. About 2 P.M. on Sunday, August 24, 1975, the victim, a white man thirty-four years old, came out of a store in Dorchester and walked toward his car. The defendant, a black man of eighteen, tiptoed behind him and hit him on the head with a baseball bat. The defendant then went into a building, changed his clothes, and crossed the street to the store, where he worked. When asked why he had hit the man, he said, "For kicks." The victim was taken to a hospital. There a large portion of the front of his skull was removed to relieve pressure on his brain, and he breathed with the aid of an artificial respirator. On August 26, his blood pressure, heartbeat and pulse were not observable, he failed to breathe when taken off the respirator for two minutes, and an electroencephalogram failed to reveal any cerebral electrical activity. On August 28, he again made no attempt to breathe when taken off the respirator, there were no reflex actions or responses to painful stimulation, and a second electroencephalogram showed no evidence of brain wave activity. After consultation with the victim's family, the respirator was removed on August 31, and his heart stopped.

1. *The proof of "brain death."* There was medical testimony that on August 25 only the part of the victim's brain responsible for the most primitive responses, the brain stem, was still to some degree working. On August 26 the remaining brain stem functions, such as responding to painful stimuli and gasping for air, had disappeared; the victim never again exhibited any signs that his brain stem or cortex was functioning. In the opinion of the responsible physician, the victim was then dead, having reached the stage of irreversible "brain death." This opinion was confirmed by an electroencephalogram on August 26 and by another on August 28. The removal of the respirator on August 31 was in accordance with good medical practice.

Commonwealth *v.* Golston.

An autopsy the next day revealed a brain without architecture, a decomposed, jelly-like mass, consistent with a brain dead for substantially more than two days. The medical examiner concluded that the victim had been dead since August 28.

According to the testimony, a definition of "brain death" was developed by the Harvard Ad Hoc Committee in 1968. The traditional definition of death as the cessation of the heartbeat is erroneous; death does not occur until the heart has stopped long enough so that there is complete loss of brain function. When the heart is maintained artificially, the brain function must be examined directly. The Harvard Committee developed basic clinical criteria, which are generally accepted by the medical community. Subsequent studies resulted in the establishment by an interagency committee of slightly less rigorous criteria, but the physicians attending the victim applied the original Harvard Committee criteria.

The three basic criteria were (1) unresponsiveness to normally painful stimuli, (2) absence of spontaneous movements or breathing, and (3) absence of reflexes. The diagnosis of "brain death" was to be confirmed by an electroencephalogram, and was to be observed over a twenty-four-hour period. No reported individual has ever survived when these criteria were met. In accordance with these criteria, several doctors testified that the victim was dead by August 28.

2. *The judge's instructions on "brain death."* The judge instructed the jury that "as a matter of law, the occurrence of a brain death, if you find it, satisfies the essential element of the crime of murder requiring proof beyond a reasonable doubt of the death of the victim. Brain death occurs when, in the opinion of a licensed physician, based on ordinary and accepted standards of medical practice, there has been a total and irreversible cessation of spontaneous brain functions and further attempts at resuscitation or continued supportive maintenance would not be successful in restoring such functions." The judge also submitted two questions to the jury, to be answered if they found the

defendant guilty of murder in either the first or the second degree: (1) whether they found that the element of death in the crime of murder was satisfied by the proof of a brain death; (2) if so, whether the brain death occurred before or after the artificial life support was disconnected. The jury answered the first question, "Yes," and the second, "Before."

The defendant claims error in these instructions. He relies on the definition of "death" in Black's Law Dictionary 488 (rev. 4th ed. 1968): "The cessation of life; the ceasing to exist; defined by physicians as a total stoppage of the circulation of the blood, and a cessation of the animal and vital functions consequent thereon, such as respiration, pulsation, etc." He cites a number of civil cases that have relied on that definition, the latest being *Schmitt* v. *Pierce,* 344 S.W. 2d 120, 133 (Mo. 1961) (simultaneous death). Accord, *Estate of Schmidt,* 261 Cal. App. 2d 262, 273 (1968). Cf. *Ohashi* v. *Blanchard,* 2 Mass. App. Ct. 863 (1974). He also cites *Commonwealth* v. *Edelin,* 371 Mass. 497, 519 (1976), where three Justices approved a modern medical definition of "liveborn infant" in terms of "heartbeat" and "respiration."

Thus, the defendant claims, the judge changed the law, invading the province of the Legislature. Moreover, he says, the change was retroactive, was not foreseeable by the defendant, and was an ex post facto law and a denial of due process of law, citing *Bouie* v. *Columbia,* 378 U.S. 347, 353-354 (1964), and *Commonwealth* v. *Benjamin,* 358 Mass. 672, 679-680 (1971). The result was to deprive the defendant of the possible defense that the victim would have lived more than a year and a day, on the basis of a decision to disconnect the respirator made by doctors and by the victim's family. Both the doctors and the family, it is argued, may have had an interest adverse to that of the defendant.

We reject these arguments. We recognize of course, as did the judge, that proof of the death of the victim is essential to a prosecution for murder. Moreover, although Black's Law Dictionary does not have the force of a stat-

ute or even a judicial decision, we accept its definition of death as "cessation of life" or "ceasing to exist," as did the judge. But its assertion that death is "defined by physicians" in a certain way does not freeze the medical definition for all time, and its references to respiration and pulsation must be taken to refer to spontaneous rather than artificially supported functions. Civil cases on miscellaneous issues such as simultaneous death do not necessarily control the law of homicide. Recent homicide cases in other jurisdictions support the judge's rulings. *People* v. *Saldana*, 47 Cal. App. 3d 954, 958-959 (1975). *State* v. *Brown*, 8 Or. App. 72, 75-76 (1972). See *In re Quinlan*, 70 N.J. 10, 51-52 (1976); cf. *New York City Health & Hosps. Corp.* v. *Sulsona*, 81 Misc. 2d 1002, 1007 (N.Y. Sup. Ct. 1975) (Uniform Anatomical Gift Act). Those rulings are also consistent with modern statutes in a number of States.[1]

So far as we can ascertain, this court has never before decided the question when death occurs for the purposes of the law of homicide. The judge recognized the significant technological advances in the area of artificial life support and applied traditional principles, we think correctly, to the novel case presented. "The rules and principles of the common law ... are broad and expansive enough to embrace all new cases as they arise." *Commonwealth* v. *Webster*, 5 Cush. 295, 322 (1850). The judge made an "evolutionary restatement" of the rule rather than a substantively new rule. See *Commonwealth* v. *McHoul*, 352 Mass. 544, 547 (1967). Proof of the same facts would permit conviction under either the old or the new formulation, and there was no lack of fair warning to the defendant. See *Stokes* v. *Commonwealth*, 368 Mass. 754, 773 (1975);

---

[1] See, e.g., Alaska Stat. § 09.65.120 (Cum. Supp. 1976); Cal. Health & Safety Code Ann. § 7180 (Deering 1975); Ga. Code Ann. § 88-1715.1 (Cum. Supp. 1976); Ill. Rev. Stat. c. 3, § 552 (1975); Kan. Stat. Ann. § 77-202 (Cum. Supp. 1976); Md. Ann. Code art. 43, § 54F (Cum. Supp. 1976); Mich. Comp. Laws Ann. § 326.8b (Cum. Supp. 1976); N.M. Stat. Ann. § 1-2-2.2 (Cum. Supp. 1975); Okla. Stat. tit. 63, § 1-301 (Cum. Supp. 1976); 1975 Or. Laws Spec. Sess. c. 565, § 1; Tenn. Code Ann. § 53-459 (1977); Va. Code § 32-364.3:1 (Cum. Supp. 1976); W. Va. Code § 16-19-1 (Cum. Supp. 1976).

*Commonwealth* v. *Harrington,* 367 Mass. 13, 21 (1975);
*Commonwealth* v. *Benjamin,* 358 Mass. 672, 680 (1971).

It is true that we have several times recognized a common law rule "that to constitute criminal homicide the victim of the assault must die within a year and a day from the time of the infliction of the mortal wound." *Commonwealth* v. *Pinnick,* 354 Mass. 13, 15 n.1 (1968). *Commonwealth* v. *Vanetzian,* 350 Mass. 491, 493 n.1 (1966). *Commonwealth* v. *Macloon,* 101 Mass. 1, 6 (1869). *Commonwealth* v. *Parker,* 2 Pick. 550, 558 (1824). In none of those cases was the reference to the rule essential to the decision of any issue before the court, and in none of them was there any suggestion that the rule had any application to a case like the present, where the victim died within a week. We reject any such suggestion. "The difficulty in proving that the blow caused the death after so long an interval was obviously the basis of the rule. Now that doctors know infinitely more, it seems strange that the year-and-a-day rule should survive to the present...." W.R. LaFave & A.W. Scott, Jr., Criminal Law § 35, at 266 (1972). Cf. R. Perkins, Criminal Law 29 (2d ed. 1969). The rule has been abolished by statute in New York. *People* v. *Brengard,* 265 N.Y. 100, 107-108 (1934). In at least two other States it has been abolished by judicial decision. *State* v. *Young,* 148 N.J. Super. 405 (1977). *Commonwealth* v. *Ladd,* 402 Pa. 164, 173-175 (1960). See Annot., 60 A.L.R.3d 1323 (1974). We take this occasion to announce that if the point comes before us we shall feel free to reexamine the justification for the rule. Cf. *Commonwealth* v. *Barnes,* 369 Mass. 462, 468 (1976).

To avoid misunderstanding, we emphasize that we consider the issue of "brain death" only as it affects conviction. We do not consider the numerous other situations in which the question when death occurs might arise. See Charron, Death: A Philosophical Perspective on the Legal Definitions, 1975 Wash. U.L.Q. 979; Compton, Telling the Time of Human Death by Statute: An Essential and Progressive Trend, 31 Wash. & Lee L. Rev. 521 (1974); Capron & Kass, A Statutory Definition of the Standards for

Determining Human Death: An Appraisal and a Proposal, 121 U. Pa. L. Rev. 87 (1972).

3. *Prejudice and proximate cause.* Since our decision involves a Federal constitutional question on which we do not have the last word, we consider the situation presented if we are wrong in upholding the judge's instructions as to "brain death." There is in this case no doubt whatever that the victim was dead on August 31, the date the respirator was disconnected. The defendant asked the judge to instruct the jury that the victim had died on August 30, as stated in the death certificate. Somewhat inconsistently, however, the defendant argues that he was entitled to a jury decision on whether the withdrawal of the respiratory support system on August 31 was an intervening cause of death, citing *Commonwealth* v. *Giacomazza,* 311 Mass. 456, 463 (1942).

The judge charged the jury with respect to the issue of intervening cause, and no argument is now presented that there was error in those instructions. It seems clear, in view of the jury's answers to the special questions put to them by the judge, that they never reached that issue, since they found that "brain death" occurred before the artificial life support was disconnected. But that finding necessarily included a finding that the act of the attending physicians in disconnecting the respirator did not involve reckless disregard of probable harmful consequences to the victim. In the language of the judge's charge, that act was a superseding act, the "sole cause" rather than a "contributing cause" of the victim's death, if the physicians' conduct was "wanton and reckless," but not if it was merely "improper or negligent."

"Where a man, without justification or excuse, causes the death of another by the intentional use of a dangerous weapon likely to destroy life, he is responsible for the consequences, upon the principle ... that he is liable for the natural and probable consequences of his act." *Commonwealth* v. *Webster,* 5 Cush. 295, 306 (1850). In *Commonwealth* v. *Hackett,* 2 Allen 136, 137 (1861), this court approved a charge to the jury "that if, in the present case,

they were satisfied that the wounds inflicted by the defendant were improperly and unskilfully treated by the surgeons in attendance, and that such treatment hastened or contributed to the death of the deceased, the defendant was not for this reason entitled to an acquittal." See *Commonwealth* v. *Costley,* 118 Mass. 1, 27 (1875); cf. *Commonwealth* v. *Giacomazza,* 311 Mass. 456, 463 (1942), and cases cited. See W.R. LaFave & A.W. Scott, Jr., Criminal Law § 35, at 259 (1972); R. Perkins, Criminal Law 31, 715-719 (2d ed. 1969).

It thus appears that, if the issue of "brain death" had not been submitted to the jury, the same evidence would have been considered on the issue whether the doctor's conduct in disconnecting the respirator was an independent supervening cause of death. The outcome would have been the same. Cf. *Henderson* v. *Kibbe,* 431 U.S. 145, 154-157 (1977). We conclude that any error in the submission of the "brain death" issue was harmless beyond a reasonable doubt.

4. *Related issues.* As the Commonwealth contends, a number of the defendant's arguments are disposed of once the validity of the "brain death" standard is accepted. Thus we do not further consider assignments of error that are completely dependent on rejection of that standard. We refer briefly to other related issues.

a. *Qualifications of experts.* There was no abuse of discretion in the admission of medical opinion testimony by doctors who were not neurologists. *Commonwealth* v. *Fournier,* 372 Mass. 346, 350 (1977). *Commonwealth* v. *Boyd,* 367 Mass. 169, 182 (1975).

b. *Expert testimony on time of death.* The subject of "brain death" was not one of common knowledge on which the jury could reach a conclusion without expert assistance. See *Commonwealth* v. *Devlin,* 365 Mass. 149, 152 (1974). It is not a valid objection that a witness is asked the precise question to be determined by the jury where his expert opinion would be of assistance to them. *Commonwealth* v. *Chapin,* 333 Mass. 610, 625 (1956), and cases cited.

c. *Scope of cross-examination.* It was entirely immaterial whether there were "life functions" in existence in the victim's body when the respirator was disconnected, whether there were recorded cases in which patients survived on respiratory systems for more than a year and a day, and how long the victim could have been maintained with respiratory support. The exclusion of questions on the possibility of organ transplants and on the victim's religious preference was within the judge's discretion in view of the remoteness of their relevance. *Commonwealth* v. *Turner,* 371 Mass. 803, 811 (1977).

On cross-examination of a defense expert, the prosecutor asked a question which assumed that the victim had stopped breathing before surgery. The defendant objected that there was no evidence of such a stoppage. The judge said he would instruct the jury that recollection of the evidence was entirely for their collective memory, overruled the objection, and later gave the promised instruction. In fact the testimony had been that artificial respiration would have been started only if the victim "had stopped breathing or [was] breathing in an unstable fashion." The expert answered that stoppage of respiration would "not necessarily indicate any brain damage." That answer was entirely harmless, and could not have prejudiced the defendant.

d. *Medical definition of brain death.* Testimony as to the general acceptance of the "brain death" standard in the medical community was directly relevant both to the issue of time of death and to the issue of proximate cause. It was not beyond the competence of the medical witnesses, and they did not purport to give a "legal" definition.

5. *Other issues.* We discuss the remaining assignments of error in the order in which they arose before and during trial.

a. *Continuance.* The defendant assigns error in the denial of his motion for a continuance because "Boston had been plagued by racial violence." There was no showing of public interest focused on this case, and the judge

was justified in relying on alternative measures to protect the defendant's rights to trial by an impartial jury. *Commonwealth* v. *Vitello,* 367 Mass. 224, 236-239 (1975). The judge's interrogation of individual jurors as to racial prejudice was resourceful and thorough. *Commonwealth* v. *Gilday,* 367 Mass. 474, 491-492 (1975). The defendant felt that it was unnecessary to sequester the jury, and there is no indication that the jury were prejudiced. There was no abuse of discretion. *Commonwealth* v. *Gilchrest,* 364 Mass. 272, 276 (1973).

b. *Challenge to the venire.* The defendant's motion to dismiss the venire on the ground that it contained only four blacks out of sixty persons was properly denied. See *Commonwealth* v. *Peters,* 372 Mass. 319, 321-324 (1977). There was no showing of purposeful or systematic exclusion. The prosecution used no challenges to exclude black jurors, and two black jurors sat on the jury.

c. *Qualification of a juror.* One prospective juror, white, disclosed that her husband and son had been attacked by blacks some months before the trial, but stated that she could render a fair and impartial judgment based on the evidence. The judge found her indifferent, overruling the defendant's challenge for cause. The defendant exercised a peremptory challenge, and later exhausted his peremptory challenges. There was no abuse of discretion. *Commonwealth* v. *French,* 357 Mass. 356, 400, A-13 (1970), judgments vacated as to death penalty sub nom. *Limone* v. *Massachusetts,* 408 U.S. 936 (1972). See *Commonwealth* v. *Dickerson,* 372 Mass. 783, 794 (1977).

d. *Gruesome testimony.* A witness for the Commonwealth testified to the sound made by the defendant's blow to the victim's head: "Just like you hit a wet, you know, like a bat hit a wet baseball, that's how it sounded." The evidence was properly admitted. *Commonwealth* v. *Robertson,* 357 Mass. 559, 563 (1970). In his discretion the judge could decide that its inflammatory nature did not outweigh its probative value. See *Commonwealth* v. *Richmond,* 371 Mass. 563, 564 (1976).

e. *Extreme atrocity or cruelty.* The defendant argues

that it was error to submit to the jury the issue of murder in the first degree by reason of extreme atrocity or cruelty. There was evidence of great and unusual violence in the blow, which caused a four-inch cut on the side of the skull. There was also evidence that after he was struck the victim fell to the street, and that five minutes later he tried to get up, staggered to his feet and fell again to the ground. He was breathing very hard and a neighbor wiped vomit from his nose and mouth. Later, according to the testimony, the defendant said he did it, "For kicks."

This issue must be left largely to the jury. *Commonwealth* v. *Lacy*, 371 Mass. 363, 367 (1976). There is no requirement that the defendant know that his act was extremely atrocious or cruel, and no requirement of deliberate premeditation. *Commonwealth* v. *Gilbert*, 165 Mass. 45, 58-59 (1895). A murder may be committed with extreme atrocity or cruelty even though death results from a single blow. *Commonwealth* v. *Knowlton*, 265 Mass. 382, 388-389 (1928). Cf. *Commonwealth* v. *Doherty*, 353 Mass. 197, 212-213 (1967), cert. denied, 390 U.S. 982 (1968) (shotgun); *Commonwealth* v. *Gilbert, supra* (axe). Indifference to the victim's pain, as well as actual knowledge of it and taking pleasure in it, is cruelty; and extreme cruelty is only a higher degree of cruelty. *Commonwealth* v. *Gilbert, supra.* There was no error.

f. *Manslaughter.* The defendant requested that the jury be instructed on voluntary manslaughter, but made no such request as to involuntary manslaughter. He now constructs an implausible hypothesis that he did not intend to kill or to inflict serious bodily harm. His afterthought is without merit. *Commonwealth* v. *Earltop*, 372 Mass. 199, 203 (1977). *Commonwealth* v. *Clark*, 363 Mass. 467, 471-472 (1973), and cases cited.

g. *Special questions.* There was no error in the submission of special questions to the jury to serve as an aid to this court. *Commonwealth* v. *Beneficial Fin. Co.*, 360 Mass. 188, 299-300 (1971), cert. denied sub nom. *Farrell* v. *Massachusetts*, 407 U.S. 910, and sub nom. *Beneficial Fin. Co.* v. *Massachusetts*, 407 U.S. 914 (1972). There was here

no tendency to lead the jurors step by step to a verdict of guilty. See *United States* v. *Spock,* 416 F.2d 165, 182 (1st Cir. 1969).

6. *Section 33E.* In accordance with our duty under G. L. c. 278, § 33E, we have reviewed the entire record and find no reason to change the ultimate outcome.

*Judgment affirmed.*