UNITED STATES, Appellee,

v.

Private (E1) Kevin M. GOMEZ, SSN
082–48–9238, United States
Army, Appellant.

CM 440547.

U. S. Army Court of Military Review.

10 March 1983.

Captain Edward J. Walinsky, JAGC, argued the cause for the appellant. With him on the brief were Joseph A. Ryan, Esquire; Colonel William G. Eckhardt, JAGC; Major Raymond C. Ruppert, JAGC; Major Charles A. Byler, JAGC; Major Robert C. Rhodes, JAGC; and Captain James A. McAtamney, JAGC.

Captain David H. Johnson, JAGC, argued the cause for the appellee. With him on the brief were Colonel R.R. Boller, JAGC; Colonel James Kucera, JAGC; Lieutenant Colonel John T. Edwards, JAGC; Major Joseph A. Rehyansky, JAGC; and Captain Kenneth H. Clevenger, JAGC.

Before HANSEN, O'DONNELL and FOREMAN, Appellate Military Judges.

## OPINION OF THE COURT

HANSEN, Chief Judge:

Contrary to his pleas, appellant was found guilty, by a general court-martial composed of officer and enlisted members, of attempted obstruction of justice and premeditated murder in violation of Articles 80 and 118, Uniform Code of Military Justice, 10 U.S.C. §§ 880 and 918, respectively. The case was tried as not capital. Appellant was sentenced to a bad-conduct discharge, confinement at hard labor for life, reduction to Private E–1, and forfeiture of $100.00 per month for twelve months. The convening authority approved the sentence.

Appellant assigns numerous errors for our consideration. We deem it appropriate to discuss the sufficiency of the evidence of premeditated murder, the brain death issue, the Jencks Act question, and the sufficiency of the evidence of attempted obstruction of justice. With regard to these issues, appellant asserts that the evidence is insufficient to establish that he struck the victim or that the attack was premeditated. He also contends that he was relieved of criminal liability for the victim's death when the physicians erroneously applied a brain death standard of death and subsequently withdrew the patient's life support system, thereby killing him. He also contends that the Jencks Act was violated and that a Government rebuttal witness should not have been permitted to testify. We disagree with the assignments of error and affirm.

### I. Sufficiency of the Evidence of Premeditated Murder

The appellant asserts the evidence is insufficient, based on three primary factors:

(1) the unreliable quality of the testimony of the key government witnesses, (2) the alibi asserted at trial, and (3) the lack of physical evidence.

During the early morning hours of 25 November 1979, the victim was bludgeoned about the head while asleep in bed with the appellant's wife at her quarters in the Alimanu Military Housing Community near Fort Shafter, Hawaii. The appellant and his estranged wife, Cyndi, were then living apart, with the appellant restricted to his company area. As a result of the attack, the victim was rendered unconscious, appellant's wife and another guest in the quarters were awakened and the assailant quickly fled from the apartment. The military police were contacted and the victim was transported to Tripler Army Medical Center for treatment where he subsequently died.

The appellant possessed a sufficient motive for the murder of the victim. Cyndi Gomez was determined to divorce the appellant despite his verbal and physical protestations and had separated from him while occupying their government quarters. In addition, she was in possession of some photographs which depicted a semi-nude young girl posed in their apartment bedroom. These photographs had some significance to an ongoing Criminal Investigation Division inquiry involving the appellant. Mrs. Gomez refused to give them to the appellant or to the criminal investigators when requested to do so. During the period of separation the evidence clearly establishes that the appellant repeatedly harrassed and threatened both his wife and the lives of others with whom she associated. His restriction was in part caused by these threats. Appellant specifically stated that if he found Cyndi with another man he would kill them both. On one occasion, appellant issued threats when his wife was in the company of the victim. On the evening of the incident, appellant was observed at the Hickam Air Force Base NCO Club while his wife was again with the victim.

We are equally satisfied that the appellant had the ability and opportunity to enter the apartment. During the period of separation the appellant demonstrated that he could enter the apartment at will, thereby breaking his restriction, and that despite the surrendering of a set of his automobile keys, he could continue to operate his vehicle. Despite his restricted status the appellant frequently and covertly followed his wife and later would inform her of her activities. He frequently removed objects from the apartment, some 18 miles from his barracks, and then phoned his wife to have her look for them. The circumstances under which the assailant was able to secrete himself in the apartment without detection and locate the hammer, which was apparently utilized in the assault, point to someone who was familiar with the premises.

The appellant's wife and Karen Smith, a friend who was sleeping on the couch in the front room on the night of the attack, also identified the appellant as being the individual who was in the apartment at the time of the assault. Initially, they told law enforcement personnel who arrived on the scene that they did not know who had struck the victim; however, when the phone rang shortly after the military police personnel arrived, both women screamed "It's him! It's him!" The caller did not identify himself, but kept saying, "What's going on?" and "Man, I just called to find out what's going on." The caller was subsequently identified as the appellant.

Specialist Smith, the appellant's barracks roommate, originally indicated that he had no information concerning the case. However, on 28 December 1979 he revealed to investigators that sometime before dawn on the morning of 25 November the appellant came into their room, fully dressed, and said that he hit a man in the head with a hammer and he thought the man would die. The appellant then changed into his bathrobe, which he was wearing when he made the telephone call to his apartment. On a later occasion, the date of which is uncertain to Smith, the appellant confided to him that he went to his wife's apartment to get something and hid in the attic when he heard people coming. The appellant stated

he climbed down when the people went to sleep, and looked in on his son and wife. He saw a man in bed with her, got a hammer, and went into the bedroom and hit the sleeping man in the head. Finally, the appellant told Smith that he drove his car back to the barracks and threw the hammer away en route.

The appellant contends that the evidence proves that it would be impossible for him to have been at the apartment at the time of the attack based on the times and distances involved and the testimony placing him at his barracks charge of quarters desk no later than 0400. The appellant asserts that the offense occurred after 0340 and that it would be impossible for him to commit the crime and travel the distance involved in so short a time. In rejecting the appellant's interpretation of the evidence, we note the problem with conflicting testimony regarding time recollections by the various witnesses. We are satisfied from the evidence that the attack took place well before 0340 hours, not after, as the appellant contends, as the call to the hospital for an ambulance was received at 0345. While there is some confusion as to the specific times involved, there is a plethora of evidence that there was a considerable time lag from the initial assault to the call for an ambulance. Evidence was also provided that appellant's car engine was still warm in the hours immediately following the attack on the victim. We are, therefore, satisfied that the appellant would have sufficient time to commit the crime, exit, travel, change clothes and phone his wife's apartment. Accordingly, we reject the appellant's assertion of an alibi defense.

Appellant also contends that the evidence against him is insufficient because of the lack of physical evidence linking him to the scene. It is true that the murder weapon was never found and that no blood was found on the appellant's clothes. It is equally true that the only item missing from the apartment following the attack was a hammer, an item which medical testimony linked to the victim's injuries. The appellant's statement to Smith that he disposed of the hammer he used to strike the

victim on the way back to the barracks accounts for the missing evidence. Additional testimony indicated that the blows were struck in such a manner that the assailant was not likely sprayed or splattered with the blood of the victim. In any event, the absence of physical evidence, as termed by the appellant, certainly would not preclude conviction under the facts as presented.

The appellant finally contends that the testimony against him from the three key witnesses is inherently unreliable. We have considered the fact that Cyndi Gomez, Karen Smith and Specialist Smith all failed to implicate the appellant, or anyone else, when first questioned about the crime, and we are satisfied with their explanations. Cyndi Gomez explained at trial that the reason she did this was that she was still married to the appellant and she felt remorse because he may have committed the crime in response to her conduct. Moreover, she was afraid of the appellant, who had previously assaulted her, threatened to kill people, attacked the victim, and was still moving about at will, despite being on restriction. Karen Smith explained that she also was afraid of the appellant, who telephoned her the day after the attack on the victim. This phone call prompted her to exclaim in the presence of a woman who was with her at the time, "Oh my God, he knows I'm here. He knows I saw him." Specialist Smith explained that he initially withheld information because he was very close to the appellant, considered him like a brother, and did not want to offer evidence against him. He realized that he was wrong to withhold information and confided in two other soldiers about the appellant's admissions. He decided to tell what he knew when he learned that the investigators interviewed one of the soldiers to whom he had spoken.

In summary, credible eyewitness testimony places the appellant at the scene of the attack and shows that he had sufficient motive. The statements by the appellant to Specialist Smith of his actions constitute a virtually complete confession. Appellant's

call to the apartment following the attack to "find out what was going on there" is most incriminating in light of the fact that absent personal knowledge of the attack, he would have had no reason to suspect a problem at his wife's quarters at 0400 hours. The warm automobile engine, the attempt to solicit a false alibi story from a fellow confinee (which will be developed more fully later in this opinion) and his subsequent statement to his wife that she was lucky to have awakened during the attack or else she "would have gotten it too" complete the web of circumstantial evidence and support the veracity of the eyewitnesses and the confession given to the roommate. Contrary then, to the appellant's assertions and exercising the Court's fact-finding authority under Article 66, Uniform Code of Military Justice, 10 U.S.C. § 866, we are convinced beyond a reasonable doubt, as was the general court-martial, that the appellant assaulted the victim and that the fatal blows were administered with the requisite premeditation as required by Article 118, Uniform Code of Military Justice, 10 U.S.C. § 918.

## II. Brain Death

Appellant asserts that the assault did not cause the victim's death and that the most he could be convicted of was aggravated assault. He argues that the military judge applied the wrong "death" standard and that the deceased was legally "alive" when he was removed from the respirator. Appellant also argues that the removal of the deceased from the respirator constituted an intervening cause of death which relieves him of criminal responsibility for that death.

We hold that the military judge properly instructed the jury on "brain death" as the correct standard for determining death under Article 118, Uniform Code of Military Justice, 10 U.S.C. § 918. We find as a factual matter that (1) the victim was "dead" before he was removed from the respirator, and (2) the physician's actions in treating the deceased did not constitute an intervening act relieving the appellant of the responsibility for his conduct. We proceed now to develop the basis for these conclusions.

At the outset, we note that the issue of when death occurs is one of first impression in the military. Neither Article 118, Uniform Code of Military Justice, nor paragraph 197, Manual for Courts-Martial, United States, 1969 (Revised edition), address the issue. Moreover no military cases have been cited to us nor has our own research revealed pertinent military authorities. As a result, we, as did the trial judge, find ourselves on uncharted ground.[1]

Under Article 118, Uniform Code of Military Justice, the death of the victim is an essential element of murder. The common law advises us that death is: "[t]he cessation of life; the ceasing to exist; defined by physicians as a total stoppage of the circulation of the blood, and a cessation of the animal and vital functions consequent thereon, such as respiration, pulsation, etc." *Black's Law Dictionary* 488 (rev. 4th ed. 1968). This early definition of death was adequate for its time but it does not take into account the subsequent advances which have been made in medical technology. At common law when the heart and lungs ceased functioning the individual was dead. Today, in many cases, life support equipment can maintain cardiac and respiratory functions in an otherwise inanimate corpse for an indefinite period. Yet under a reading of the common law definition of death, the patient remains "alive" even though the brain and all other functions are dead.[2] But the definition of death under the com-

1. *See generally* Kaczynski, "We Find the Accused (Guilty) (Not Guilty) of Homicide": *Toward a New Definition of Death*," The Army Lawyer, June 1982, at 1.

2. In response to this situation some 25 states have adopted brain death statutes. *See Lovato v. District Court In & For Tenth Judicial District,* 198 Colo. 419, 601 P.2d 1072, 1079 n. 19 (1979). Others have reached similar results by judicial decisions. *See, e.g., Lovato v. District Court, supra; Commonwealth v. Golston,* 373 Mass. 249, 366 N.E.2d 744 (1977); *In re Welfare of Bowman,* 94 Wash.2d 407, 617 P.2d 731 (1980).

mon law did not fix its meaning for all time. Indeed the rule itself envisions an evolutionary process of death as advances in medical technology and the learning of physicians explore the realities of life and death. In our view, the common law is sufficiently flexible and broad to take into account the technological advances in the area of artificial life support and military law should be equally adaptable. *Commonwealth v. Golston,* 373 Mass. 249, 366 N.E.2d 744 (1977).

We therefore hold that the appropriate standard for determining the time of death in a military homicide case is the common law definition of death in its modern form. Under that standard, an individual is dead who has sustained either (1) irreversible cessation of circulatory and respiratory functions or (2) irreversible cessation of total brain functions. The determination in either case must be made in accordance with accepted medical standards, such as the Harvard Brain Death tests. *Lovato v. District Court In & For Tenth Judicial District,* 198 Colo. 419, 601 P.2d 1072 (1979); *Commonwealth v. Golston, supra.*

In the case before us, the victim was transported to Tripler Army Medical Center where he was attended by a Navy neurosurgeon. In his initial examination of the patient, the neurosurgeon observed that the victim had suffered a massive injury to the head and multiple lacerations to the scalp, some of which were exuding blood and brain tissue. The victim was in a deep coma, his pulse rate was slow, and his breathing was shallow and inefficient. He exhibited only a slight response to painful stimuli. The prognosis at that point, based on the type of injury and the level of neurological response, was that the patient would not survive. X-rays revealed a massive fracture of the skull with pieces of bone driven into the brain. The skull was split and the left cheek bone and jaw were fractured.

The neurosurgeon determined that immediate surgery was necessary. During surgery, he observed that the skull was cracked, splintered, and pieces of it had been driven into the left hemisphere of the brain. The underlying temporal muscle was massively lacerated and macerated, and the main blood vessel to the brain had been destroyed. The neurosurgeon removed bone splinters, blood clots, and pieces of dead brain in order to prevent hemorrhaging. However, the pressure inside the skull increased dangerously after the patient had been returned to intensive care. A computerized scan of the brain revealed a blood clot and massive swelling of the entire brain; a second operation was performed. Thirty minutes after the second operation, the neurosurgeon observed that the victim did not respond to painful stimuli and that he displayed no spontaneous respiration. At this point the attending physicians believed that the victim had suffered total brain death.

The neurosurgeon and four o_her physicians met in order to test the brain death conclusion. They employed the "Harvard Criteria"[3] and consulted the state brain death statute.[4] All five physicians participated in the testing. The victim was subjected to painful stimuli, the respirator was

3. *Report of the Ad Hoc Committee of the Harvard Medical School to Examine the Definition of Brain Death: A Definition of "Irreversible Coma,"* 205 J.A.M.A. 85 (1968). The criteria used to examine brain death are: responsiveness to stimuli, spontaneous movement or breathing, reflex activity, and electroencephalogram testing.

4. Hawaii Rev.Stat. § 327C–1 (1981). The substantive portions of the Hawaiian statute closely follow the Harvard Brain Death tests. Procedural licensing and reporting requirements were administrative only and not applicable on the Federal reservation. *See, e.g., Leslie Miller, Inc. v. Arkansas,* 352 U.S. 187, 77 S.Ct. 257, 1 L.Ed.2d 231 (1956); *Pacific Coast Dairy, Inc. v. Department of Agriculture of California,* 318 U.S. 285, 63 S.Ct. 628, 87 L.Ed. 761 (1942). Nevertheless state law may provide valuable guidelines to a Federal court, in the absence of Federal law, as it seeks to provide a brain death standard and seeks objective criteria to offer the fact-finder in evaluating the physician's conduct. State substantive law can be of particular value when it corresponds with the tests approved in this opinion.

turned down several times so that he would have to initiate his own breathing, tests were made of his cornea reflexes and his ability to swallow. Two electroencephalograms to identify existing brain functions were conducted at a 26-hour interval after the doctors had assured the absence of hypothermia and barbituates which might affect the test results. The results of these tests were negative, and confirmed the doctors' conclusion that brain death had occurred. Finally, the physicians consulted with the victim's family who agreed to terminate the respiratory effort. When the respirator support was withdrawn the body made no attempt to draw breath, and eight minutes later the heart stopped beating. The victim then was pronounced dead.

The military judge instructed the jury as follows:

Death is defined as either the irreversible cessation of spontaneous respiration and circulatory functions; or the irreversible cessation of the brain function. The irreversible cessation of brain function occurs where, in the opinion of a qualified physician, or physicians, based on ordinary and accepted standards of medical practice, there has been a total and irreversible cessation of spontaneous brain functions and further attempts at resuscitation or continued supportive maintenance would not be successful in restoring such functions. In reaching such a decision, ordinary and accepted standards of medical practice require the physician or physicians to consider the following: First, was [the victim] unresponsive to normally painful stimuli; second, did [the victim] display an absence of spontaneous movements or breathing; third, did [the victim] display an absence of reflexes; and fourth, did electroencephalograms, conducted at least twenty-four hours apart, confirm the diagnosis of brain death. The burden is on the United States to establish brain death beyond a reasonable doubt. Thus, the prosecution must establish the above criteria of brain death beyond a reasonable doubt. Further, in order to find the accused guilty of any degree of homicide, you must find beyond a reasonable doubt that [the victim] was dead before the permanent removal of the respirator.

■ We believe the military judge correctly guided the evolution of military law. He was not required to ignore existing scientific fact, and went no further than to recognize the existing state of the law. *Commonwealth v. Golston, supra.* His instructions on brain death were adequately fashioned according to the medical testimony presented at trial and to those traditional legal principles which were appropriate to this unusual case.[5] The Harvard Brain Death Criteria offer appropriate guidelines for physicians faced with the problem of defining death. When incorporated into the instruction of the military judge, the Harvard Brain Death Criteria also provide guidelines to the finders of fact in determining whether the physicians properly determined that death existed. While we believe that the common law definition of death is still valid and useful in military law, under appropriate circumstances brain death may also legally signal the end to heroic resuscitation efforts. "In effect the doctors were just passively stepping aside to let the natural course of events lead from brain death to common law death." *State v. Fierro,* 124 Ariz. 182, 186, 603 P.2d 74, 78 (1979). In either case the victim was legally dead for the purposes of Article 118, Uniform Code of Military Justice, 10 U.S.C. § 918. The jury properly reached its conclusion that the victim was dead before the respirator was disconnected as required under the instructions. Exercising, under Article 66 of the Uniform Code of Military Justice, 10 U.S.C. § 866, our fact-finding power and responsibility, we also find that the victim had "joined that innumerable caravan and moved to his chamber in the silent halls of death," *Lovato v. District Court, supra,* 601 P.2d at 1075, before the

5. The references to a cardio-respiratory test for life under common law refers to spontaneous rather than artificially supported functions which can mask the underlying certainty of death. *Commonwealth v. Golston, supra.*

extraordinary efforts of life support were terminated.

In addition, the military judge instructed the court that they must find that the death of the victim was the natural and probable consequence of the assault and not the result of an independent intervening cause in which the accused did not participate and which he could not have foreseen.

■ At an early date, the Court of Military Appeals adopted the rule that the accused's act need only contribute to the death of the victim. *United States v. Houghton,* 13 U.S.C.M.A. 3, 32 C.M.R. 3 (1962); *United States v. Schreiber,* 5 U.S.C. M.A. 602, 18 C.M.R. 226 (1955). The act must be, however, a major or material cause of the death. *United States v. Moglia,* 3 M.J. 216 (C.M.A.1977); *United States v. Horner,* 1 M.J. 227 (C.M.A.1975). The intervening cause, in order to relieve an accused of criminal responsibility for his acts must be such that it "intervenes between the original wrongful act or omission and the injury, turns aside the natural sequence of events, and produces a result which would not otherwise have followed and which could not have been reasonably anticipated." *United States v. King,* 4 M.J. 785 (N.C.M.R.1977), *aff'd,* 7 M.J. 207 (C.M. A.1979) (summary disposition).

■ It can be reasonably anticipated that a victim of an assault will receive medical attention. *United States v. Eddy,* 26 C.M.R. 718 (A.B.R.1958). The nature and intensity of the medical treatment will vary with the seriousness of the wounds inflicted. Similarly, the more complex the

required treatment is, the more opportunity for error on the part of the attending physician. In assessing the quality of medical treatment, the military rule is well settled that simple negligence will not suffice as an intervening cause to relieve an accused of his criminal responsibility. *United States v. Eddy, supra; United States v. Wilson,* 5 C.M.R. 218 (A.B.R.1952); *United States v. Baguex,* 2 C.M.R. 424 (A.B.R.1952), aff'd, 2 U.S.C.M.A. 306, 8 C.M.R. 106 (1953). The principle we adopt is that where an accused intentionally inflicts a wound clearly calculated to endanger or destroy life, it is not a defense to a charge of homicide that the victim's death was contributed to by the negligence of the attending physician. Before an accused can be relieved of the consequences of his acts, the treatment of the attending physicians must rise to the level of gross negligence of such a nature as to turn aside the course of probable recovery. *State v. Shaffer,* 223 Kan. 244, 574 P.2d 205 (1977).

■ The record before us demonstrates no negligence, much less that degree which would serve to relieve the appellant of the consequences of his actions. The seriousness of the wounds which appellant inflicted were clearly fatal and were recognized as such by the attending neurosurgeon. The two operations were nothing more than a reflection of the proper exercise of the medical ethic to attempt every possible heroic measure, no matter how hopeless, to save a life. In our view, the instruction on intervening cause as related to medical treatment was a gratuity,[6] and the court, as

---

6. By the way in which he framed his instructions, the military judge precluded the Government from arguing or the court from applying the principles relating to medical treatment by physicians to the act of turning off the respirator. In our view the military judge held the Government to a higher standard than necessary by requiring the jury to find that brain death had to have occurred before the victim was removed from the respirator. Civilian courts which have addressed the issue of medical negligence in this factual context have uniformly held that removal of the victim from the respirator prior to brain death does not relieve an accused of responsibility if the decision by the physician to do so was no more than simple negligence. *State v. Fierro,* 124 Ariz. 182, 603 P.2d 74 (1979); *People v. Saldana,* 121 Cal. Rptr. 243, 47 Cal.App.3d 954 (1975); *State v. Shaffer,* 223 Kan. 244, 574 P.2d 205 (1977); *State v. Holsclaw,* 42 N.C.App. 696, 257 S.E.2d 650 (1979), *pet. denied,* 298 N.C. 571, 261 S.E.2d 126 (1979); *State v. Johnson,* 56 Ohio St.2d 35, 381 N.E.2d 637 (1978); *State v. Brown,* 8 Or.App. 72, 491 P.2d 1193 (1971). It is enough that the accused's act in bludgeoning the victim was a contributing factor which, in conjunction with the reasonable subsequent acts of the physicians in not continuing the life support system, proximately caused the death.

do we, found no intervening cause. We accordingly find no merit in appellant's assignment of error.

### III. Jencks Act Issue

Appellant contends that the military judge erred when he refused to strike the in-court testimony of the military police dispatcher whose form, reflecting the time the appellant's wife reported the crime, had been destroyed. This form is denominated a "Record of Complaint." It contains spaces for information relating to the nature of the complaint ranging from aggravated assault to stray animal, the location and time of the incident, identity of the complainant and subject, vehicle identification, dispatch of assistance and law enforcement agencies notified. The defense made a timely objection to the testimony of the military police dispatcher. The dispatcher's testimony, given in rebuttal, as to the time the call was received went to the question of alibi and was adverse to the appellant. The appellant contends that since the dispatcher recorded the time of the call on a card, which was subsequently destroyed before the defense could examine it, the failure of the Government to produce the card for defense inspection and use as a possible source of impeachment warranted the sanctions of the Jencks Act. 18 U.S.C. § 3500. The military judge overruled the objection and permitted the dispatcher to testify.

The appellant argues that the completed form was a statement covered by the Jencks Act, that the Government had a duty to preserve the form once it was prepared, and that the destruction of the form, irrespective of the reason for doing so, requires striking of the dispatcher's testimony. We hold that (1) the Record of Complaint form was not a "statement" within the purview of the Act and (2) the Record of Complaint form was not within the "possession of the United States" as required by the Act. Accordingly, the military judge, under the circumstances of this case, correctly imposed no sanctions. We turn now to a discussion of our holding.

■ The Jencks Act applies in the military; however, not every written document constitutes a "statement" within the purview of the Act. In *Palermo v. United States*, 360 U.S. 343, 350, 79 S.Ct. 1217, 1223–1224, 3 L.Ed.2d 1287 (1959), the Supreme Court noted that the legislative history of the Act reflected the intent of Congress to limit the production of documents to those which constituted "statements."

In terms of this case the distinction most frequently drawn is between interview notes relating to another's testimony and the surveillance or personal notes of the police officer. This distinction is critical for our case as there is less danger that the purposes behind the act will be frustrated in the situation involving the police officer's personal observations as distinguished from his recordation of a witness's statements. *See Palermo v. United States*, 360 U.S. 343, 352–53, 79 S.Ct. 1217, 1224–1225, 3 L.Ed.2d 1287 (1959); *United States v. Bernard*, 623 F.2d 551, 558 (9th Cir.1979). The Supreme Court has recognized that rough notes may not be statements under the Act when they are merely "a memorandum giving names, places and hours." *United States v. Augenblick*, 393 U.S. 348, 354–55, 89 S.Ct. 528, 532–533, 21 L.Ed.2d 537 (1969). The overwhelming weight of authority follows *Augenblick* to the effect that surveillance and observation notes are not producible "statements" within the Jencks Act. *See, e.g., United States v. Spencer*, 618 F.2d 605 (9th Cir.1980) (police officer's rough notes of investigation not "statement"); *United States v. Cuesta*, 597 F.2d 903 (5th Cir.), *cert. denied*, 444 U.S. 964, 100 S.Ct. 451, 62 L.Ed.2d 377 (1979) (investigator's notes not "statement"); *United States v. Bernard, supra* (Government agent's truncated personal notes not "statement"); *United States v. Lane*, 574 F.2d 1019 (10th Cir.), *cert. denied*, 439 U.S. 867, 99 S.Ct. 193, 58 L.Ed.2d 177 (1978) (notes of undercover activity not

Such was the case *sub judice*. *United States v. Houghton*, 13 U.S.C.M.A. 3, 32 C.M.R. 3 (1962); *United States v. Schreiber*, 5 U.S.C.M.A. 602,

18 C.M.R. 226 (1955); *United States v. Baguex*, 2 C.M.R. 424 (ABR 1952), *aff'd*, 2 U.S.C.M.A. 306, 8 C.M.R. 106 (1953).

"statement"); *United States v. Carrasco,* 537 F.2d 372 (9th Cir.1976) (preliminary notes of agent not "statement"); *United States v. Atkinson,* 513 F.2d 38 (4th Cir. 1975) (personal notations not "statement"); *United States v. Catalano,* 491 F.2d 268 (2d Cir.1974) (surveillance logs not "statement"); *Canaday v. United States,* 354 F.2d 849 (8th Cir.1966) (agent's diary listing people he met not "statement").

The circumstances under which such notes are taken may distort the purposes for which the Act was passed, i.e., to provide a potential source of impeachment from material for which the witness is held accountable while avoiding the danger of distortion and misrepresentation inherent in cryptic and episodic notes. With regard to this latter point, in *United States v. Griffin,* 659 F.2d 932, 937 (9th Cir.1981), the Ninth Circuit, in holding that agent's notes are not discoverable under the Jencks Act, pointed out: "In the first place, with regard to that portion of an agent's notes which record his thoughts and observations independent of the interviewee's remarks, an agent's rough notes usually are considered too cryptic and incomplete to constitute the full statement envisioned by the Jencks Act." Such notes are sketchy and incomplete, often made in a hurry and will usually encompass only the recorder's own impressions and observations. Ordinarily, these notes are hastily made under circumstances where not even substantially verbatim notes, much less completed statements, are possible. *Fields v. United States,* 368 A.2d 537, 542 (D.C.App.1977). *See United States v. Scriber,* 499 F.2d 1041 (D.C.Cir. 1974) (crime scene observations not "statement"); *March v. United States,* 362 A.2d 691 (D.C.App.1976) (initial interview of victim resulting in "Negro male, 16–25 years of age. Slim build, 5′8″ to 5′9″. Black leather three-quarter length jacket and dark trousers" not "statement").

The military rule appropriately follows these authorities. By way of illustration, this Court has previously held that "pinpoint words" and "short thoughts" taken down by a CID agent during an interview with a stabbing victim did not constitute a statement under the Jencks Act. *United States v. Harris,* CM 438133 (A.C.M.R. 12 February 1980) (unpub.), *pet. denied,* 9 M.J. 122 (C.M.A.1980). Similarly, in *United States v. Durden,* 14 M.J. 507 (A.F.C.M.R. 1982), the Air Force Court of Military Review also held that short "memory jogger" notes are not statements as defined by the Jencks Act.

In the instant case, the military dispatcher testified that she received a call from a hysterical woman who reported that she thought someone was dead and needed help. Due to the condition of the caller, the dispatcher was unable to identify the caller and was "lucky" to get the quarters' number. The dispatcher believed that the call reflected a domestic disturbance in family quarters. After dispatching a patrol car to the appellant's quarters, she entered information about the call, including the time it was received, on the card. Testimony reflected that the cards had been designed by the local Provost Marshal to serve as a source document for input into a computerized "police blotter" intended for use by commanders and other military authorities. The computerized report, however, had not been implemented and was, in fact, behind schedule. The cards were normally retained for six months and then destroyed because they served no purpose without the computer and took up filing space. In his special findings of fact, the military judge found that the "writing" constituted, at best, a "rough note."

■ Thus, the file card was nothing more than a series of pre-printed entries to be checked off and completed by the military dispatcher as a reflection of her daily activities. The dispatcher performed essentially a clerical function involving the recording of only enough information to identify the caller, the subject of the call, and action taken. The purpose for keeping such information was wholly unrelated to an investigation and in these circumstances can only correctly be categorized as "make work" of an administrative nature reflecting daily activity for a system which had not as yet

been established. We believe that the rules applying to surveillance as personal notes rather than interview notes apply in this case. Thus, the logs kept by the military police to reflect daily activities in a matter of due course are not statements of the recording clerk but instead constitute merely a part of the administrative internal record-keeping practice. *United States v. Pennett,* 496 F.2d 293 (10th Cir.1974). Under these circumstances, and considering that the burden of proof is upon the appellant to establish that particular matters qualify as "statements," *United States v. Pennett, supra; United States v. Smaldone,* 484 F.2d 311 (10th Cir.1973), we hold that the rough notes made by the military dispatcher for administrative purposes did not constitute statements within the purview of the Jencks Act.[7]

■ But even if the form is a "statement," it must also be in the "possession of the United States" within the meaning of the Act. 18 U.S.C. § 3500(b). In *United States v. Trevino,* 556 F.2d 1265, 1271 (5th Cir.1977), the Fifth Circuit held that mere Federal employee status was not sufficient—the statement had to be in the hands of the Federal prosecution. This view is consistent with statutory changes to the Act. Prior statutory language which covered statements made "to an agent of the United States" was amended to apply only to statements "in the possession of the United States." *See United States v. Calley,* 46 C.M.R. 1131, 1190–92 (ACMR), *aff'd,* 23 U.S.C.M.A. 534, 48 C.M.R. 19 (1973). The courts which have considered the issue have generally held that the Jencks Act applies only to materials in the possession of the prosecutorial arm of the United States. *See United States v. Goldberg,* 582 F.2d 483 (9th Cir.1978) (witness's notes not covered by Jencks Act), *cert. denied,* 440 U.S. 973, 99 S.Ct. 1538, 59 L.Ed.2d 790 (1979); *United States v. Trevino, supra* (document in possession of probation officer not covered), *reh'g denied,* 562 F.2d 1258 (5th Cir.1977); *United States v. Dansker,* 537 F.2d 40 (3d Cir.1976) (statements in the probation report not covered), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977); *Beavers v. United States,* 351 F.2d 507 (9th Cir.1965) (tape recording in the hands of state authorities not covered); *United States v. Ehrlichman,* 389 F.Supp. 95 (D.C.D.C.1974) (act not applicable to executive sessions of Subcommittee on Intelligence of Armed Services Committee of the House of Representatives); *Government of Virgin Islands v. Rodriguez,* 300 F.Supp. 860 (D.C. Virgin Islands 1969) (detective's personal notes from own records not covered).

The distinction drawn in the civil cases is aptly illustrated in the military context by *United States v. Ali,* 12 M.J. 1018 (A.C.M.R. 1982), where the court held that statements submitted to a company commander who was then engaged in the prosecutorial function were covered but that other statements that were submitted to the charge of quarters were not. In the latter case, while the charge of quarters was in a sense a representative of the commander, his engagement in the prosecutorial function was too tenuous as to invoke the provisions of the Act.[8]

---

7. We are aware that a line of cases has held that case activity or surveillance notes are "statements" when the notes are included in investigative files or have been related to an investigator. *See, e.g., United States v. Albo,* 22 U.S.C.M.A. 30, 46 C.M.R. 30 (1972); *United States v. Bosier,* 12 M.J. 1010 (A.C.M.R.1982); *United States v. Kilmon,* 10 M.J. 543 (N.C.M.R. 1980); *United States v. Dixon,* 7 M.J. 556 (A.C.M.R.1979). However, the circumstances here are different as the information was not gathered, processed or retained in a criminal investigative mode. Accordingly, the general rule that rough notes are not "statements" applies.

8. While at first blush, decisions such as *United States v. Carrasco,* 537 F.2d 372 (9th Cir.1976); *United States v. Kilmon,* 10 M.J. 543 (N.C.M.R. 1980); and *United States v. Bosier,* 12 M.J. 1010 (A.C.M.R.1982), appear to be contrary to the result reached in this decision, those cases must be distinguished. In these cases the witness was either an undercover informant working as a member of the prosecutorial arm of the Government, or his notes had been imparted to the Government in a manner which made the notes an integral part of the investigation. Under these circumstances, the statements could be said to be in the "possession of the United States" as required by the Act. In the case *sub*

In the instant case, neither the military dispatcher who took the call nor the clerk who received and ultimately destroyed the forms were engaged in the prosecutorial function. Although both became aware of the Gomez case, neither knew that the complaint card was relevant to the case. The responsible CID agent advised that when he checked the tape recording he was unaware of any backup complaint cards that might be relevant, nor was he advised of their existence. He also confirmed that none of the military police filing personnel were engaged in the investigative effort. To be sure one must more closely examine the circumstances when law enforcement agencies are involved; however, we decline to adopt a *per se* rule which would hold that any documents held by law enforcement agencies are in the possession of the prosecutorial arm of the United States. A line must be drawn between administrative functions of the military police station and its investigative functions. In our view the result is the same as though the call for help had been made to the hospital rather than to the military dispatcher. We hold that the military judge was correct when he ruled that the records were not within the prosecutorial arm of the United States and therefore not subject to Jencks Act production.

## IV. *Attempted Obstruction of Justice*

Appellant contends that the evidence is insufficient to convict him of attempted obstruction of justice. The basis of his appeal is the unreliability of the witness, Leverne Harmon. Harmon was an Army enlisted man who had been convicted of possessing and selling drugs and sentenced to a punitive discharge and confinement. Harmon was in the Naval confinement facility at the same time as the appellant, who was serving confinement from a prior court-martial and also awaiting trial for the murder of Sergeant Crawford. Harmon was pending transfer to the Disciplinary Barracks at Fort Leavenworth but wanted to

stay at the Pearl Harbor brig because his wife was stationed in Hawaii, and he did not want "Fort Leavenworth" to appear on his record. He expressed this concern to the appellant, who had remained at Pearl Harbor for a longer time than normal for an Army prisoner and might have had some ideas on how Harmon might avoid transfer. Harmon also approached the command, through his defense counsel, and offered to provide information about drug dealers in return for leniency so that his transfer to the mainland would be delayed.

Prior to trial, the appellant approached Harmon and told him that if he mentioned appellant's name to General Lynn (the initial convening authority for both Harmon and Gomez) that it would assist Harmon in avoiding Leavenworth. Additionally, the appellant stated that there might be two or three hundred dollars in it for Harmon and his wife. At a subsequent meeting, the appellant asked Harmon if he had seen General Lynn. Harmon replied that he had, that he would see the General again but that he needed specifics to mention to the convening authority if he was to remain in Hawaii. The appellant suggested a number of false details such as the date, time and location of a fictitious party supposedly attended by appellant at Harmon's house at the time of the assault and the necessity to say that appellant was wearing a shirt other than a red shirt which was the color mentioned by the witnesses. In addition, appellant told Harmon to have his wife and another lady support this false alibi to the murder of the victim. Hoping to parlay this information into retention in Hawaii, Harmon advised his defense counsel. Harmon's conduct ultimately resulted in an additional charge against the appellant of obstructing justice. The appellant was acquitted of the offense as charged but was convicted of attempted obstruction of justice under Article 80, Uniform Code of Military Justice, 10 U.S.C. § 880.

---

*judice,* however, the document was not created as a part of the investigative process, the writer was not engaged in that process, the document was not kept as a part of that process, and, it

was destroyed in a routine administrative manner without ever having been incorporated into a criminal investigation.

The appellant contends his conviction on the additional charge cannot stand because of Harmon's unreliability. We disagree with this proposition and will address the factual issue shortly but we first feel compelled to consider whether, as a matter of law, the conviction can stand.

The offense of which the appellant now stands convicted is an attempt to obstruct justice by soliciting Harmon to falsely provide the appellant with an alibi. By providing a false alibi through Harmon to the convening authority appellant hoped to avoid trial. There is little dispute in criminal law that criminal intent, by itself, does not constitute a crime but rather some form of *actus reus* must accompany the intent. The crime of attempt requires, *inter alia,* that this act be more than mere preparation and constitute at least the beginning of its effectuation. Article 80, Uniform Code of Military Justice, 10 U.S.C. § 880; paragraph 159, Manual for Courts-Martial, United States, 1969 (Revised edition); *United States v. Reid,* 12 U.S.C.M.A. 497, 31 C.M.R. 83 (1961). Case law is replete with cases which discuss the moment when the line of demarcation between preparation and direct movement towards the offense of attempt is crossed. In *United States v. Goff,* 5 M.J. 817 (ACMR 1978), aff'd, 10 M.J. 23 (CMA 1980), the concept of what constitutes a "substantial step" towards the commission of criminal attempt was defined as conduct which is strongly corroborative of the firmness of the defendant's criminal intent. The difference between mere preparation and forward movement toward commission of the crime is consistently one of fact, not law. *United States v. Choat,* 7 U.S.C.M.A. 187, 21 C.M.R. 313 (1956). Almost all acts short of the actual commission of the crime can be said to constitute preparation of some sort. In resolving the factual question, the issue is whether the acts of preparation, when coupled with the requisite intent, have reached a point at which they pose a danger to society which should be recognized. The mere solicitation of another to commit a crime does not constitute an attempt. *State v. Otto,* 102 Idaho 250, 629 P.2d 646, 647 (1981); *Gervin v. State,* 212 Tenn. 653, 371 S.W.2d 449, 450–51 (1963).

The question then arises in determining whether or not the appellant, by the manner of his solicitation, advanced sufficiently beyond the mere preparation stage.[9] We believe he did. In this case, the appellant approached Harmon initially with a solicitation and an offer of money which, while constituting an offense under Article 134, Uniform Code of Military Justice, did not at that point constitute an attempt. *State v. Otto, supra,* 629 P.2d at 646. *Contra, State v. Mandel,* 78 Ariz. 226, 278 P.2d 413 (1954); *State v. Gay,* 4 Wash.App. 834, 486 P.2d 341 (1971). The record is not clear that there was a formal agreement at this initial conversation; however, the next discussion between appellant and Harmon left no reasonable doubt in the appellant's mind that Harmon was (1) cooperating in the alibi scheme, (2) had initiated his contact with General Lynn in furtherance thereof and, (3) only needed more detailed information to complete the process. Accordingly, appellant, believing that Harmon was acting in accordance with his earlier solicitation, supplied him with that specific information necessary for an alibi and sought more corroboration from Harmon's wife and another female. It is this action by the appellant, coupled with his belief that the potential obstruction was ongoing, that is corroborative of the firmness of his intent and which sufficiently advances the appellant beyond the "mere preparation" stage. See *Braham v. State,* 571 P.2d 631 (Alaska 1977); *Stokes v. State,* 92 Miss. 415, 46 So. 627 (1908).

There is no doubt that Harmon's credibility is suspect, but one does not normally expect pillars of truth to be found confined within the stockade. Events which take place in such an environment where the

---

9. "It is recognized, of course, that a close relationship exists between solicitation and attempt. In the early stages of criminal activity, the two offenses may run parallel courses." *State v. Otto,* 102 Idaho 250, 629 P.2d 646, 647 (1981).

credibility of witnesses can be so important must be carefully evaluated; however, convicted soldiers are not incompetent to testify. Mil.R.Evid. 601. To hold otherwise would preclude judicial intervention into affairs in the stockade—an institution where such intervention is often most needed.

Clearly, Harmon was prepared to do almost anything to delay his departure to Fort Leavenworth, and viewed his conversation with appellant as his "ace in the hole." Nevertheless, we do not find Harmon to be the perfidious miscreant appellant makes him out to be. He openly discussed the illicit activities that had led to his own conviction and the motivation to work as an informant. His prior drug use, which had led him to the stockade, had ceased and it appeared that his drug-free environment had continued into civilian life. A confinement official testified that Harmon had convincingly established his rehabilitation, and it appears that at the time of appellant's trial, Harmon held four part-time jobs to sustain himself lawfully. Any initial motive to falsify his story to avoid shipment to Fort Leavenworth had dissipated prior to appellant's trial as Harmon was out of confinement and no longer in the service. Finally, we see some corroboration in the specifics of the information purportedly related by appellant to Harmon. Details of the time to be covered by the false alibi and the color of the clothing to be avoided could only have been provided by someone such as the appellant who was intimately familiar with the circumstances.

The court members, as the triers of fact, under appropriate instruction, heard the witness, observed his personal demeanor, and evaluated Harmon's credibility and concluded the accused's guilt was established beyond a reasonable doubt. Because of their superior position to judge the credibility of witnesses, the court members' determinations of fact should not be lightly disregarded. *United States v. Frierson*, 20 U.S.C.M.A. 452, 454, 43 C.M.R. 292, 294 (1971); *United States v. Albright*, 9 U.S.C. M.A. 628, 631, 26 C.M.R. 408, 411 (1958). Exercising our own fact-finding powers and responsibility under Article 66(c), Uniform Code of Military Justice, 10 U.S.C. § 866(c), we also conclude that appellant's guilt was proven beyond a reasonable doubt, and the assigned error is held to be without merit.

*Assignments of Error By Appellant*

We have considered the five errors listed by appellant in his request for appellate counsel and find them to be without merit. *United States v. Grostefon*, 12 M.J. 431 (C.M.A.1982).

The approved findings of guilty and the sentence are affirmed.

Senior Judge O'DONNELL and Judge FOREMAN concur.