UNITED STATES

v.

**Senior Airman Edward C. STANLEY, United States Air Force.**

ACM 34825.

U.S. Air Force Court of Criminal Appeals.

Sentence Adjudged 9 Aug. 2001.

1 July 2004.

Appellate Counsel for Appellant: Colonel Beverly B. Knott, Major Terry L. McElyea, and Major Kyle R. Jacobson.

Appellate Counsel for the United States: Colonel LeEllen Coacher, Lieutenant Colonel Lance B. Sigmon, and Lieutenant Colonel David N. Cooper.

Before STONE, Senior Judge, MOODY, and JOHNSON, Appellate Military Judges.

OPINION OF THE COURT

STONE, Senior Judge:

The appellant pled not guilty to two charges stemming from the death of his infant son. A military judge, sitting alone at a general court-martial, found the appellant guilty, as charged, of involuntary manslaughter by culpable negligence, a violation of Article 119(b)(1), UCMJ, and maiming, a violation of Article 124, UCMJ, 10 U.S.C.

§§ 919(b)(1), 924. The convening authority approved the adjudged sentence of a dishonorable discharge, confinement for 6 years, forfeiture of all pay and allowances, and reduction to the grade of E–1.

The appellant raises two issues for our consideration. First, he contends that the involuntary manslaughter charge is legally and factually insufficient. In this regard, he argues that the proximate cause of his son's death was not the injuries the baby received from being severely shaken; rather, he contends the removal of artificial life support before his son was considered brain dead was an intervening cause of death. Alternatively, if this Court rules adversely to him on the first issue, he argues that because the involuntary manslaughter and maiming charges arise from the same act of shaking, conviction for both offenses violates the Double Jeopardy Clause of the Fifth Amendment of the United States Constitution.

For the reasons set forth below, we conclude that the appellant's actions were the proximate cause of his son's death and hold that the involuntary manslaughter charge is legally and factually sufficient. Even so, we agree that conviction for both maiming and involuntary manslaughter violates the principle of double jeopardy. We order conditional relief on that basis.

## FACTS

Timothy Stanley was born on 29 April 2000 at the Ehrling Bergquist Hospital, Offutt Air Force Base, Nebraska. He resided with his mother, Senior Airman (SrA) Anna Jackson, and his father, the appellant. At the time, SrA Jackson and the appellant were engaged.

On 11 June 2000, SrA Jackson left Timothy in the sole care of the appellant while she went to a local video store. Upon her return 30 minutes later, she observed the appellant sitting on the couch holding their six-week-old son. Sensing that something was seriously wrong, she took Timothy from the appellant's arms and discovered that the baby was "completely limp and was not breathing."

She insisted they immediately go to the Ehrling Bergquist Hospital, an eight to ten minute drive away. Upon arrival at the emergency room, Timothy still was not breathing and appeared "limp and ashen." An experienced emergency room nurse promptly administered CPR, and the baby was resuscitated. Soon thereafter, Timothy was transferred to the pediatric intensive care unit at Children's Hospital in Omaha, Nebraska.

At Children's Hospital, Timothy was placed on a respirator because he was unable to breathe on his own. He later began to breathe more or less spontaneously. However, the respirator was kept in place to further assess and evaluate his condition. Additionally, he received a nasogastric tube and intravenous fluids to provide nutrition and hydration. Doctors initiated artificial life support measures because Timothy lacked a gag reflex and suck response, and thus was unable to ingest food or liquids on his own.

Doctors immediately assessed the infant's condition as non-accidental trauma. The specific diagnosis was shaken baby syndrome (SBS). This is an established medical diagnosis typically involving very small children who are violently shaken. According to experts who testified at trial, SBS involves a constellation of injuries to the bones, eyes, and brain. Timothy's bodily injuries involved all these areas. Radiological testing revealed he suffered three acute fractures to his extremities. He also sustained two fractured ribs, most probably due to squeezing during the course of being severely shaken. Additionally, a pediatric ophthalmologist identified massive retinal hemorrhages and damage to the nerve sheath around both eyes. Finally, expert witnesses provided extensive testimony concerning Timothy's brain injuries, all concluding that he suffered severe, widespread damage to his brain. Because the brain injury was so traumatic, Timothy stopped breathing almost immediately after being shaken. Lack of oxygen caused significant cerebral atrophy and ultimately the death and permanent loss of significant portions of his brain.

The appellant made numerous statements to investigators, friends, and co-workers

about how Timothy was injured. Although he never admitted to shaking Timothy in a manner consistent with the trauma the child sustained, he told several individuals his actions must have been the cause of the baby's injuries.

## PROXIMATE CAUSATION

### A. Issue

At trial, the defense counsel argued that the evidence was insufficient to establish shaking as the proximate cause of Timothy's death. On appeal, the appellant continues to challenge the legal and factual sufficiency of the evidence as it relates to proximate cause. He asserts that the withdrawal of artificially administered hydration and nourishment was a superseding intervening cause relieving him of criminal liability for involuntary manslaughter. In support of this argument, the appellant emphasizes that Timothy was not considered brain dead at the time of withdrawal, and that the child was able to breathe on his own for eight days once artificial respiration was removed. He contends that even though the medical examiner and other experts testified that Timothy would have died eventually after living for a period of time in a persistent vegetative state, the immediate cause of death, and the reason the baby's body stopped functioning, was dehydration.

### B. Removal of Life Support

Dr. Ivan M. Pavkovic, a pediatric neurologist at Children's Hospital, examined Timothy and testified at trial that he found the child "neurologically devastated." It was Dr. Pavkovic's opinion "to a reasonable degree of medical certainty" that Timothy's "brain dysfunction was so severe or so global in nature as to render the outcome of this child as being in a persistent vegetative state." He defined "persistent vegetative state" as a condition that prevents an individual from having any meaningful interaction with the environment—no self-awareness, no consciousness, no cognitive or sensory perception, and no emotional devel-

opment. He testified that individuals in a persistent vegetative state have only minimal brain stem function, consisting, at best, of some level of reflexive motor activity.

He contrasted persistent vegetative state with "brain death" by explaining that one who is brain dead has a total absence of brain function, to include no brain stem function or electrical activity. Dr. Pavkovic testified that Timothy did not meet these medical criteria because he retained some brain stem function and because tests revealed some electrical activity, albeit highly abnormal. From a medical standpoint, he said, Timothy was never considered brain dead.

Nonetheless, many of Timothy's brain stem functions were either impaired or absent. According to Dr. Pavkovic, the most significant brain stem functions Timothy lacked were a gag reflex and a sucking response. For the long-term treatment of the child, Dr. Pavkovic testified, Timothy would need to receive sustenance through artificial means. Additionally, a tracheostomy, a surgical opening of the trachea, would be necessary to maintain an airway and to remove secretions from the lungs. With or without the tracheostomy, he testified, the child would be at constant risk of aspirating fluids into his lungs, which would lead to recurring lung infections and pneumonia. Dr. Pavkovic considered this "aggressive" medical treatment because it was his opinion the child was never going to recover. He testified that the "most likely outcome" for Timothy, based upon a reasonable degree of certainty, was either: (1) death from medical complications of his brain injury or (2) living in a persistent vegetative state for no more than two to two-and-one-half years, in the event he survived the expected complications.[1]

The appellant and SrA Jackson were advised of their son's medical status and likely outcome, including the option of removing artificial life support. It soon became apparent, however, that the parents had a fundamental difference of opinion. The appellant

---

1. At common law, an accused could not be convicted of murder unless the victim's death occurred within a year and a day of the injury. This common law rule was omitted from military practice in 1951 because it was considered "archaic." *Legal and Legislative Basis, Manual for Courts-Martial, United States,* 269 (1951).

opposed any effort to remove artificial life support.

Because of this conflict, SrA Jackson filed a motion in the District Court of Sarpy County, Nebraska, and asked for sole custody of her child. Children's Hospital joined as an intervenor in support of the motion, which was heard on 23 June 2000. The appellant attended the hearing with his counsel and provided testimony. That same day, the state court rendered a decision and awarded SrA Jackson temporary custody of Timothy, specifically granting her "sole authority to make medical decisions for Timothy C. Stanley, born April 29, 2000 to include a directive of do not resuscitate."

Based upon this court order and with the concurrence of Dr. Pavkovic and the attending physician, SrA Jackson approved an advance medical directive order to withhold resuscitative services—often referred to as a "do not resuscitate" order. The directive took effect on the same day as the court order. According to written hospital policy, such decisions

> should be based upon a medical determination that the patient's underlying disease is incurable and the patient's death is expected or that resuscitation would be futile or of no benefit or even burdensome to the patient. The decision not to resuscitate a patient is a form of withholding life-sustaining treatment and should be made subject to the same consideration of utility and benefit to the patient as other life sustaining treatments.

The "do not resuscitate order" listed the specific medical interventions that were not to be instituted, to include administration of artificially administered nutrition and hydration.

The same day of the court order, Timothy was taken off ventilation. As Dr. Pavkovic expected, the infant continued to breathe on his own. Very soon thereafter, artificial hydration and nutrition were removed. Timothy died eight days later on 1 July 2000.

Dr. Jerry Jones, a medical examiner, testified as an expert in forensic pathology and provided the military judge with the findings from Timothy's autopsy. Dr. Jones's post-mortem examination of Timothy's brain revealed "necrosis," the death of brain tissue over multiple areas of the brain, to include scarring and atrophy. He testified that Timothy's brain injury was "responsible for the death of the deceased and without which the death would not have occurred." He listed shaken baby syndrome as the cause of death on the death certificate. In response to questions from the trial defense counsel concerning the role dehydration had on the infant's demise, Dr. Jones responded:

> [W]e have a [medical] definition of cause of death, and the cause of death is the disease or injury . . . without which the death would not have occurred. Anything that occurs in between there [are] simply complications in sequelae of the original disease or injury responsible for the death. . . . Everything has to revert back to the root cause which is the diffuse brain injury induced by shaking that caused this infant's death.
>
> . . . .
>
> A medical decision was made . . . that he was not going to recover any significant brain function ever in the future so it was a mutual decision that says this child is not going to recover. . . . [T]hey decide mutually . . . to terminate all life support. . . . [D]ehydration is going to be a natural consequence of withholding that. But it . . . is not contributory to the cause of death.

Dr. Wilbur Smith, an expert in radiology and SBS, also testified. After reviewing all the medical records and hearing the testimony provided at trial, he characterized Timothy's injuries as "very bad, not survivable" and opined that the infant had a fatal head injury at the time he entered the hospital and never would recover.

### C. Standard of Review

We apply two standards of review for questions involving the sufficiency of the evidence. The test for legal sufficiency is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner,* 25 M.J. 324 (C.M.A.1987) (citing *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d

560 (1979)). The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are ourselves] convinced of the accused's guilt beyond a reasonable doubt." *Turner*, 25 M.J. at 325.

### D. Law

■ The *Manual for Courts–Martial, United States (MCM)*, defines "culpable negligence" as:

[A] negligent act or omission accompanied by a culpable disregard for the foreseeable consequences to others of that act or omission. Thus, the basis of a charge of involuntary manslaughter may be a negligent act or omission which, when viewed in the light of human experience, might foreseeably result in the death of another, even though death would not necessarily be a natural and probable consequence of the act or omission.

*MCM*, Part IV, ¶ 44c(2)(a)(i) (2000 ed.). The test for foreseeability is an objective one and requires a determination of "whether a reasonable person, in view of all the circumstances, would have realized the substantial and unjustifiable danger created by his [or her] acts." *United States v. Henderson*, 23 M.J. 77, 80 (C.M.A.1986). *See also United States v. Oxendine*, 55 M.J. 323, 325 (C.A.A.F.2001).

Drawing from the common law, our superior court has long held that "[t]o be proximate, an act need not be the sole cause of death, nor must it be the immediate cause— the latest in time and space preceding the death. But a contributing cause is deemed proximate only if it plays a material role in the victim's [death]." *United States v. Cooke*, 18 M.J. 152, 154 (C.M.A.1984) (quoting *United States v. Romero*, 1 M.J. 227, 230 (C.M.A.1975)). *See also United States v. Houghton*, 32 C.M.R. 3, 1962 WL 4440 (C.M.A.1962); 1 Warren, *Homicide* § 59 (perm ed.1938); 1 Wharton, *Criminal Law and Procedure* § 290 (1957). Our superior court in *Cooke* also favorably cited from Rollin M. Perkins and Ronald N. Boyce, *Criminal Law*, 698–701 (2d ed.1969), for the definition of intervening cause:

It must not be assumed that negligence of the deceased or of another is to be entirely disregarded. Even though the defendant was criminally negligent in his conduct it is possible for negligence of the deceased or another to intervene between this conduct and the fatal result in such a manner as to constitute a superseding cause, completely eliminating the defendant from the field of proximate causation. *This is true only in situations in which the second act of negligence looms so large in comparison with the first, that the first is not to be regarded as a substantial factor in the final result.*

*Cooke*, 18 M.J. at 154 (alteration in original). *See also United States v. Reveles*, 41 M.J. 388, 394–95 (C.A.A.F.1995); *United States v. Lingenfelter*, 30 M.J. 302, 307 (C.M.A.1990).

### E. Analysis

■ In claiming that the removal of life support "loomed so large" such that it served as a superseding cause of death, the appellant does not allege any procedural or substantive deficiencies leading up to the decision to withdraw Timothy's life support. Furthermore, it is also clear he is not claiming he was foreclosed at trial from presenting evidence on the medical care Timothy received. *Cf. United States v. Taylor*, 44 M.J. 254 (C.A.A.F.1996). Instead, the appellant focuses on the concept of brain death and asks this Court to hold that it is an independent superseding cause (1) to remove life support when an assault victim is in a persistent vegetative state and not brain dead, or (2) to remove artificially administered nutrition and hydration when an assault victim is in a persistent vegetative state and is otherwise able to breathe on his or her own. We address each of these arguments in turn below.

#### 1. Brain Death

It is well settled as to what constitutes brain death as a jural matter. Numerous states have adopted the Uniform Determination of Death Statute, including Nebraska. Dr. Pavkovic opined that Timothy was not brain dead at the time life support was removed, a conclusion consistent with Nebras-

ka law. Specifically, the Nebraska statute provides: "Only an individual who has sustained either (1) irreversible cessation of circulatory and respiratory functions, or (2) irreversible cessation of all functions of the entire brain, including the brain stem, is dead." NEB. REV. STAT. § 71–7202 (2000). This state statute governs the medical decisions made in this case by virtue of the situs of Timothy's death, a civilian hospital in Omaha.[2] Because Timothy had independent circulatory and respiratory functions and some limited brain stem function, we conclude that the infant was not legally dead under Nebraska law when artificial life support was removed.

Had Timothy been brain dead at the time doctors removed life support, causation would not be at issue. One who is brain dead is legally dead—there would be no point in looking at subsequent acts to determine if they were "intervening" causes of death. On the other hand, a conclusion that Timothy was not brain dead at the time life support was removed does not end our inquiry. As the Army Court of Military Review has succinctly noted:

> Civilian courts ... uniformly [have] held that removal of the victim from the respirator prior to brain death does not relieve an accused of responsibility if the decision by the physician to do so was no more than simple negligence. It is enough that the accused's act [is] a contributing factor which, in conjunction with the reasonable subsequent acts of the physicians in not continuing the life support system, proximately caused the death.

*Gomez*, 15 M.J. at 961 n. 6 (citations omitted) (dictum). We agree. Therefore, we continue our analysis by examining the concepts of foreseeability and intervening causes.

### 2. Removal of Artificial Nutrition and Hydration [3]

When it comes to issues of medical treatment, it is generally accepted that an accused is still criminally responsible for a person's death even though better or more skillful treatment may have prolonged or saved the victim's life. Cases that have addressed medical treatment as an intervening cause typically focus on the character of the injury (serious, dangerous, or minor) and the nature of the medical treatment (grossly negligent, negligent, or reasonable). *See, e.g., Taylor*, 44 M.J. at 254. On the issue of intervening medical treatment

> [t]he character of the wound inflicted is one of the important factors [in determining proximate causation] and courts sometime use terms such as "serious wound" or "dangerous wound" in discussing the problem here under consideration, but it is not necessary that the wound should be a mortal one. Probably no more is required than that the injury should be of *sufficient gravity* so that medical or surgical treatment may be regarded as normal.... If the wound is of such a relatively minor character that it is not of itself to be regarded as dangerous or serious and death is occasioned by "grossly erroneous treatment," the original act will not be regarded as the proximate cause of loss of life.... In other words grossly erroneous treatment may *loom so large* in the particular case that the slight injury will not be deemed a substantial factor in causing the death.

R. Perkins and R. Boyce, *Criminal Law*, 801–03 (3d ed.1982) (emphasis added). *See also* Carolyn Kelly MacWilliams, *Homicide: Liability Where Death Immediately Results from Treatment or Mistreatment of Injury Inflicted by Defendant*, 50 A.L.R. 5th 467

---

2. For comparison purposes, we note that the *MCM* does not define or otherwise address the issue of brain death. However, in *United States v. Gomez*, 15 M.J. 954, 958–62 (A.C.M.R.1983), the Army Court of Military Review adopted a definition of brain death very similar to the one found in the Uniform Determination of Death Act. *See also* Department of the Army Pamphlet 27–9, *Military Judges' Benchbook*, ¶ 7–24 (1 Apr 2001) (death is the "irreversible cessation of spontaneous respiration and circulatory func-

tions or the irreversible cessation of all functions of the entire brain, including the brain stem").

3. *See generally Cruzan v. Missouri*, 497 U.S. 261, 279, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990) (assuming without deciding that the "United States Constitution would grant a competent person a constitutionally protected right to refuse lifesaving hydration and nutrition").

(2003); *See also Cooke,* 18 M.J. at 152 (a contributing cause is deemed proximate only if it plays a material role in the victim's death).

Clearly, Timothy suffered "serious" and "dangerous" wounds at the hands of the appellant. Consequently, to relieve the appellant of liability, the medical treatment not only must have been a contributing factor in the child's death, but also a substantial or material factor that "loomed so large" so as to excuse the appellant's culpably negligent act of shaking his infant son. *See generally Taylor,* 44 M.J. at 257.

Having defined the legal analysis we will apply, we turn now to whether the removal of life support was foreseeable. In this regard, it is helpful to examine Nebraska law and the actions of the parties to determine whether SrA Jackson and the medical providers acted reasonably and in accordance with governing law. If so, the removal of artificial sustenance would be objectively and reasonably foreseeable.

As part of its health care power of attorney statute, Nebraska authorizes the removal of life support, which includes the removal of "artificially administered" nutrition and hydration in situations where an individual is suffering from a "terminal condition or is in a persistent vegetative state," and when continuance of life support would serve only to prolong the process of dying or maintain the individual in a persistent vegetative state. NEB. REV. STAT. §§ 30–3428(2), 20–403(5). Nebraska law does not authorize the removal of "usual and typical" sustenance, which is defined as the "delivery of food and fluids orally, including by cup, eating utensil, bottle, or drinking straw." "Artificially administered" sustenance, however, may be removed. *Id.* § 30–3402(14). Without a gag reflex or suck response, Timothy was unable to obtain sustenance through "usual and typical" means. Thus, the removal of artificial sustenance was an authorized medical decision under Nebraska law and the circum-

stances of this case and therefore reasonably foreseeable.

### F. Conclusion

We find SrA Jackson's decision to withhold artificially administered hydration and nutrition was a reasonable medical decision made in accordance with state law and the policies of Children's Hospital in the best interests of her child.[4] Prior to removal of life support, two physicians diagnosed Timothy as being in a persistent vegetative state and concluded that Timothy's condition was incurable and irreversible. A post-mortem examination confirmed their opinions. Further, although the evidence indicates dehydration may have contributed to the *timing* of Timothy's death, it did not play a substantial or material role in bringing about his death because the child had already suffered fatal injuries.

An accused is not shielded from manslaughter charges when artificially administered nutrition and hydration are withdrawn as part of a foreseeable, well-reasoned medical decision based upon what is considered of greatest benefit to the victim. In this case, the removal of artificially administered hydration and nutrition was a reasonable response to a situation created solely by the appellant. The decision to withdraw artificially administered sustenance while Timothy was in a persistent vegetative state did not "loom so large" as to relieve the appellant from criminal liability. When the appellant brutally shook his infant son, he set in motion an unbroken, foreseeable chain of events. Therefore, we hold that his wrongful acts were the proximate cause of Timothy's death.

### DOUBLE JEOPARDY

■ Given our decision on the first issue, the appellant now asks, in the alternative, that we set aside his conviction for maiming. He argues the maiming charge is multiplicious with his conviction for involuntary manslaughter, and thus violates the Double Jeop-

---

4. Nebraska's civil rights statute governing the terminally ill does not directly address the rights of minors. Nonetheless, it is clear the parties acted under the reasonable belief that the mother was vested with the authority to make health care decisions for Timothy by virtue of the court order granting her sole custody and specifically authorizing her to implement a do not resuscitate order. *See generally* NEB. REV. STAT. § 20–403.

ardy Clause of the Fifth Amendment to the United States Constitution.

At trial, the appellant vigorously asserted his concerns about multiplicity. Although conceding the charges could be considered in the alternative for purposes of proof, he argued that a conviction for both offenses was unconstitutional. As a fallback argument, he asked the judge to consider the offenses multiplicious for sentencing. In ruling on the defense motion, the military judge concluded the offenses were multiplicious as an "equitable matter" for sentencing purposes. He noted that the offenses involved "essentially the same act" and concluded that the "the government alleged them [separately] for exigencies of proof and for other purposes."

We conduct a de novo review of multiplicity claims. *United States v. Palagar*, 56 M.J. 294, 296 (C.A.A.F.2002). A threshold concern is whether the two offenses allege the same underlying act. In this regard, there is no real dispute between the parties that the underlying factual basis involved a single act of shaking. Indeed, the military judge found as much. Moreover, the elements and pleadings all allege the same date, place, and victim.

The next step in our analysis is to ascertain congressional intent because an "accused may not be convicted and punished under more than one statute for the same act, if it would be contrary to the intent of Congress." *United States v. Britton*, 47 M.J. 195, 197 (C.A.A.F.1997) (citing *United States v. Teters*, 37 M.J. 370, 373 (C.M.A.1993)). Thus, our specific task is to determine whether Congress intended an accused to be convicted at a single court-martial of both involuntary manslaughter through culpable negligence under Article 119(b)(1), UCMJ, and maiming under Article 124, UCMJ, where the underlying factual basis is the same for both offenses.

In order to ascertain and implement legislative intent, we look at the statute, not the pleadings or proof. In this endeavor, our superior court has provided guidance on how

to ascertain legislative intent. Thus, we look to see if Congress stated its intent

> expressly in the pertinent statute(s) violated or in their legislative histories. Absent such an overt expression of legislative intent, it can also be presumed or inferred based on the elements of the violated statutes and their relationship to each other. Finally, other recognized guidelines for discerning congressional intent may then be considered to determine whether the ... presumption of separateness is overcome by clear indication of a contrary legislative intent.

*United States v. Teters*, 37 M.J. at 376–77 (internal citations omitted). We are unable to identify any overt expressions of legislative intent. *See generally Index and Legislative History, Uniform Code of Military Justice* (1950). Nonetheless, we believe intent can be inferred or presumed based upon an analysis of the statutory definition of involuntary manslaughter and its relationship to the statutory definition for maiming.

First, it is important to note that involuntary manslaughter is defined in two distinct ways. Article 119(b), UCMJ, states:

> Any person subject to this chapter who, without an intent to kill or inflict great bodily harm, unlawfully kills a human being—
>
> (1) by culpable negligence; or
>
> (2) while perpetrating or attempting to perpetrate an offense, other than [the offenses of burglary, sodomy, rape, robbery, or aggravated arson], *directly affecting the person*; is guilty of involuntary manslaughter and shall be punished as a court-martial may direct.

*MCM*, Part IV, ¶ 44a. (Emphasis added.) The definition under Article 119(b)(1) arises from culpable negligence, the ground alleged in the case sub judice. Alternatively, involuntary manslaughter is also defined under Article 119(b)(2) as whenever an accused kills a person while in the commission of an offense "directly affecting the person." Under the common law, a crime "directly affecting a person" was referred to as a *malum in se* offense.[5]

---

5. Subsection (b)(2) specifically excludes the of-

fenses of burglary, sodomy, rape, robbery, or

Article 124, UCMJ, defines maiming as follows:

Any person, subject to this chapter who, with intent to injure, disfigure, or disable, inflicts upon the person of another an injury which

(1) seriously disfigures his person by a mutilation thereof;

(2) destroys or disables any member or organ of his body; or

(3) seriously diminishes his physical vigor by the injury of any member or organ.

*MCM*, Part IV, ¶ 50a.

By definition, maiming is a *malum in se* offense because it is a criminal offense "directly affecting the person" of another. As such, maiming constitutes a "qualifying offense" for prosecution under Article 119(b)(2). Moreover, because an act of maiming would typically constitute culpable negligence, a prosecution under Article 119(b)(1) would also follow. Thus, we can presume or infer "based on the elements of the violated statutes and their relationship to each other" that Congress did not intend for a single criminal act "directly affecting" a person to result in separate convictions for the underlying *malum in se* offense and culpably negligent manslaughter.[6] To the extent that the matter is not entirely free of doubt, the doubt must be resolved in favor of lenity. *Whalen v. United States,* 445 U.S. 684, 695 n. 10, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980). We therefore conclude Congress intended for the *malum in se* offense to be subsumed and incorporated in Article 119(a)(2), whenever a *malum in se* offense results in death.

We now turn to fashioning an appropriate remedy. We note that military appellate courts have the inherent authority to order a conditional dismissal of a charge which becomes effective when direct review becomes final pursuant to Article 71(c), UCMJ, 10 U.S.C. § 871(c). *Britton,* 47 M.J. at 202–05 (Effron, J., concurring). Therefore, we conditionally dismiss the maiming charge and its specification subject to final review pursuant to Article 71(c), UCMJ, in order to allow the government to meet the exigencies of proof on the proximate cause issue through final appellate action. Rules for Courts–Martial (R.C.M.) 907(b)(3)(B).

Having conditionally dismissed the maiming offense, we now reassess the sentence, adhering to the principles enunciated by our superior court in *United States v. Doss,* 57 M.J. 182, 185 (C.A.A.F.2002) and *United States v. Sales,* 22 M.J. 305 (C.M.A.1986). For errors of a constitutional magnitude, we must be persuaded beyond a reasonable doubt that our sentence reassessment has rendered the constitutional error harmless. *United States v. Boone,* 49 M.J. 187, 195 (C.A.A.F.1998). In ruling on the multiplicity issue at trial, the military judge stated his findings were in the alternative and entered for purposes of exigencies of proof. *See* R.C.M. 907(b)(3)(B) and R.C.M. 307(c)(4), Discussion. He went on to note that he considered the charges multiplicious for sentencing and thus determined the maximum confinement was 10 years—the maximum authorized confinement for involuntary manslaughter (as compared to 7 years for maiming). In sentencing the appellant to a dishonorable discharge, confinement for 6 years, forfeiture of all pay and allowances, and reduction to the grade of E–1, the military judge noted for purposes of appellate review that the court's sentence would have been "exactly the same" for either offense. Consequently, based upon the military judge's clear statement of intent, we are satisfied beyond a reasonable doubt that the

---

aggravated arson as a basis for an involuntary manslaughter prosecution—even though they are offenses "directly affecting" the person of another. When these more serious crimes are involved, prosecution under Article 118(4) for "felony murder" is probably more appropriate. *See generally Legal and Legislative Basis, Manual for Courts–Martial, United States,* 168–70 (1951).

**6.** It is interesting to compare Article 119(b)(2), UCMJ, to the military's felony murder statute found at Article 118(4), UCMJ, 10 U.S.C. § 918(4). For felony murder prosecutions, the President authorized conviction for both felony murder and the underlying felony. *MCM,* Part IV, ¶ 43c(5)(b)(2000 ed.). The failure to incorporate a similar provision for Article 119(b) suggests that the *President* intended to preclude convictions for both involuntary manslaughter and the underlying *malum in se* offense.

multiplicious charge had no effect on his determination of an appropriate sentence.

The approved findings, as conditionally modified, and the sentence are correct in law and fact and no error prejudicial to the substantial rights of the appellant occurred. Article 66(c), UCMJ, 10 U.S.C. § 866(c); *United States v. Reed,* 54 M.J. 37, 41 (C.A.A.F. 2000). Accordingly, the conditionally approved findings and the approved sentence are

AFFIRMED.