**UNITED STATES**

v.

**Johnathan T. MARKERT, Private First Class (E–2), U.S. Marine Corps.**

**NMCCA 200500223.**

U.S. Navy–Marine Corps Court of Criminal Appeals.

Sentence Adjudged 20 Jan. 2004.

Decided 12 July 2007.

Maj Richard Belliss, USMC, Appellate Defense Counsel.

Capt R.D. Sanchez, USMC, Appellate Defense Counsel.

Maj Wilbur Lee, USMC, Appellate Government Counsel.

LtCol Paul D. Kovac, USMCR, Appellate Government Counsel.

Before VOLLENWEIDER, Senior Judge, STOLASZ, and COUCH, Appellate Military Judges.

COUCH, Judge:

The appellant was convicted, pursuant to his pleas, by a military judge sitting as a general court-martial, of involuntary manslaughter and reckless endangerment, in violation of Articles 119 and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 919 and 934. The appellant was sentenced to confinement for three years, reduction to pay grade E–1, and a bad-conduct discharge. The convening authority approved the sentence as adjudged. After considering the record of trial, the appellant's three assignments of error, the Government's response, and the excellent oral arguments of counsel, we conclude that the findings and sentence are correct in law and fact and that no error materially prejudicial to the substantial rights of the appellant was committed. Arts. 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a) and 866(c).

## Background

The tragic events of this case began on 8 June 2003 when the appellant and Lance Corporal (LCpl) Scott S. Oldroyd, USMC, were riding in the back of a High–Mobility Multipurpose Wheeled Vehicle (HMMWV) on their way to their guard posts aboard Camp Hansen, Okinawa, Japan. Both Marines were carrying loaded 9mm service pistols. While in the back of the HMMWV, the appellant and LCpl Oldroyd engaged in horseplay by drawing their pistols, cocking the hammers back without the safeties on, and pointing the weapons at each other. Neither Marine was wearing a seatbelt. As they bounced around in the back of the HMMWV, the Marines came into physical contact with one another, causing the appellant's pistol to fire. The bullet entered the left side of LCpl Oldroyd's head, causing a transcranial gunshot wound to his brain. LCpl Oldroyd was rushed to the hospital, where he underwent emergency surgery later that same evening, and was placed on a ventilator in order to help him breathe. His parents rushed from Florida to Okinawa to be by their son's bedside. Six days after the shooting, LCpl Oldroyd's parents made the difficult decision to discontinue his life support measures. LCpl Oldroyd died within 15 to 20 minutes after his ventilator was turned off.

## Providency of Guilty Plea

In his first two assignments of error, the appellant argues that his conviction of involuntary manslaughter is legally and factually insufficient, and his guilty plea to the charge improvident, because his act of shooting LCpl Oldroyd in the head was not the proximate cause of death. Appellant's Brief and Assignments of Error of 28 Apr 2006 at 5. The premise of the appellant's assertion is that the decision of LCpl Oldroyd's parents to discontinue his life support is what caused the death and therefore, the "[a]ppellant was not the proximate cause of LCpl Oldroyd's death." *Id.*

We will not address the appellant's legal and factual sufficiency argument, as it is subsumed by our assessment of whether his guilty plea to involuntary manslaughter was provident. Because the appellant pled guilty, the issue must be analyzed in terms of the providence of his plea, not sufficiency of the evidence. *United States v. Faircloth,* 45 M.J. 172, 174 (C.A.A.F.1996).

*Facts*

In a stipulation of fact, the appellant agrees that LCpl Oldroyd's death resulted from the appellant's act of "wrongfully pointing a pistol at him, and discharging a round that struck LCpl Oldroyd in the head." Prosecution Exhibit 1 at 5. During the providence inquiry with the military judge, the appellant again admitted that he was responsible for the victim's death:

> ... I took my weapon out of my holster with the safety off and the hammer back, pointed it toward Lance Corporal Oldroyd, which then discharged a round, struck him in the head which then resulted in his death, sir.

Record at 36.

During the Government's presentencing case, Lieutenant Commander Robert E. Rosenbaum, MC, USN, the attending neurosurgeon for LCpl Oldroyd, was called as a witness.[1] Dr. Rosenbaum testified that upon

---

1. The Government contends that our review to determine the providence of the appellant's guilty plea is limited to "that evidence 'presented on the issue of guilt' (*i.e.,* during the case on the

his arrival in the emergency room, LCpl Oldroyd initially was attempting to open his eyes, but was not able to speak. The wound in the back of his head was "bigger than a golf ball, [but] a little bit smaller than a baseball." *Id.* at 73. Initially LCpl Oldroyd had an open airway and was breathing on his own, but the attending emergency room physician made the decision, in which Dr. Rosenbaum concurred, to intubate LCpl Oldroyd because they knew swelling of his brain would occur, and that could cause him trouble breathing. Dr. Rosenbaum explained that swelling, subsequent compression, and anoxia (lack of oxygen) of the brain tissue is the secondary injury in cases of trauma to the brain, and the most crucial thing to treat with injuries like the one suffered by LCpl Oldroyd. *Id.* at 74.

After Lance Corporal Oldroyd was intubated, he was given sedatives and paralytic drugs to achieve a drug-induced coma. A computer scan of his brain determined that LCpl Oldroyd had suffered a transcranial wound, meaning the bullet had passed through his brain from front to back with a slight downward angle. He suffered damage to the occipital and parietal portions of his brain, with some suspected damage to the frontal lobe, which means LCpl Oldroyd would probably have motor control loss to his upper extremities and loss of vision.

LCpl Oldroyd immediately underwent surgery to stop the bleeding in his brain, clean out the wound, and remove dead brain tissue. A ventricular drain was placed in LCpl Oldroyd's brain to help control the swelling. Dr. Rosenbaum testified that most patients with a wound like that of LCpl Oldroyd do not make it to the hospital, and those that do usually die before surgery. Dr. Rosenbaum stated that LCpl Oldroyd's surgery went well, but that there was a significant amount of damage to LCpl Oldroyd's brain, such that the bullet came within a few millimeters of causing instant death. Dr. Rosenbaum was discouraged by the severity of the injury but encouraged by the lack of depth into the brain tissue.

Dr. Rosenbaum testified that LCpl Oldroyd's family arrived at his bedside in Okinawa within 48 hours of his admission to the hospital. Dr. Rosenbaum informed the family that LCpl Oldroyd's prognosis was "not great," and that his likelihood of survival was small because of the potential for swelling in his brain. *Id.* at 85. Dr. Rosenbaum explained to the family that if LCpl Oldroyd could overcome the swelling of his brain, then the probability of his survival might improve. Within 24 to 48 hours of his family's arrival, LCpl Oldroyd's intracranial pressure (ICP) actually improved, but then started to rise again. Dr. Rosenbaum testified that at this point, he encouraged the family to deliberate whether to allow their son to undergo additional surgery in the event his ventricle drain became clogged or his ICP monitor failed. That same night LCpl Oldroyd's ICP increased again, but soon began to improve.

By 14 June 2003 (six days after his injury) LCpl Oldroyd had developed Adult Respiratory Distress Syndrome (ARDS), where the lungs become rigid and stiff, fill with fluid, and the patient has difficulty receiving sufficient oxygen. In order to treat ARDS, the settings on the patient's ventilator must be changed, which affects the patient's ICP. Dr. Rosenbaum testified that LCpl Oldroyd's temperature began to rise, probably due to infection, which also increased his ICP. However, Dr. Rosenbaum testified that LCpl Oldroyd's ICP remained within appropriate levels for someone with his injury.

At this juncture, Dr. Rosenbaum began to talk with the family daily about the decision whether to terminate LCpl Oldroyd's life support. The family received additional in-

merits)," and that the appellant cannot attack the factual and legal sufficiency of his plea by using evidence introduced during sentencing. Government's Brief of 30 Jun 2006 at 7 (quoting *United States v. Hill*, 39 M.J. 712, 714 (N.M.C.M.R. 1993)). We disagree. "In considering the adequacy of guilty pleas, we consider the entire record to determine whether the requirements of Article 45, UCMJ, 10 U.S.C. § 845, R.C.M. 910,

and *Care* and its progeny have been met." *United States v. Coffman*, 62 M.J. 676, 679 (N.M.Ct.Crim.App.2006)(citing *United States v. Jordan*, 57 M.J. 236, 239 (C.A.A.F.2002)); *see also United States v. Negron*, 60 M.J. 136, 141 (C.A.A.F.2004). We interpret the "entire record" to mean all materials submitted for our statutory review under Article 66, UCMJ, which includes evidence presented for sentencing.

put from two other neurosurgeons, a neurologist, and an intensive care specialist who was treating their son. Based upon this input, the family made the decision to discontinue life support. Dr. Rosenbaum testified that LCpl Oldroyd died within 15 to 20 minutes of when his ventilator was turned off, and that he was not in pain at the time of death. Dr. Rosenbaum stated the most significant issue for LCpl Oldroyd at the end of his life was the ARDS, described how they were having trouble ventilating him, and stated that LCpl Oldroyd was struggling to survive and having some trouble. *Id.* at 91. The trial defense counsel did not cross-examine Dr. Rosenbaum.

The victim's mother, Mrs. Carol Oldroyd, also testified on sentencing. She described how she, her husband, and her oldest son traveled to Okinawa and spent four days with LCpl Oldroyd before he died. She testified how during her second visit with her son, he responded to her voice and squeezed her hand. Mrs. Oldroyd recalled that a CAT scan on the second day after their arrival indicated LCpl Oldroyd's brain was swollen and that he would probably be blind, and she opined that "he was just getting worse." *Id.* at 102. She testified that LCpl Oldroyd's lungs were getting worse and his kidneys had started to fail. Shortly thereafter, Mrs. Oldroyd stated the family made the decision to discontinue LCpl Oldroyd's life support and explained, "Even if he survived, which it didn't look like he was going to, that he wouldn't want to live that way." *Id.* at 102. The trial defense counsel did not cross-examine Mrs. Oldroyd.

After deliberation and before announcing a sentence, the military judge conducted the following colloquy with the trial defense counsel:

MJ: Prior to announcing sentence, I've got a couple of questions for defense counsel.

In reviewing all the government and the defense exhibits, it's very clear to the court that Lance Corporal Oldroyd was soon to depart this world in spite of all the tremendous lifesaving efforts, and the best efforts, of the United States Naval Hospital over at Camp Lester. Do you see any defense whatsoever of a superseding intervening cause of the early termination of the life support that ultimately resulted in Lance Corporal Oldroyd's death?

DC: Sir, that was an issue that defense counsel discussed early on, and our opinion is that that was not an issue in this case.

MJ: It is pretty clear from all the medical documentation that Lance Corporal Oldroyd was progressively getting worse and worse and worse by the day. And ultimately, by the 14th of June, the decision was placed in the hands of the family as to what the next step was; whether it was just to wait and see. And the history being that he was getting worse and worse by the day—

DC: It is our position, sir, that death was eminent (sic). If not on the 14th, shortly thereafter.

MJ: Very well. And you see no possibility of a defense of the early termination of med—

DC: Not at all. After reviewing all the medical records and the prognosis by the doctors, we concur with that.

*Id.* at 171–72.

*Law*

 " 'A military judge's decision to accept a guilty plea is reviewed for an abuse of discretion.' " *United States v. Shaw*, 64 M.J. 460, 462 (C.A.A.F.2007)(quoting *United States v. Eberle*, 44 M.J. 374, 375 (C.A.A.F.1996)(citing *United States v. Gallegos*, 41 M.J. 446 (C.A.A.F.1995))). Pleas of guilty should not be set aside on appeal unless there is a substantial basis in law and fact for questioning the guilty plea. *United States v. Phillippe*, 63 M.J. 307, 309 (C.A.A.F.2006)(quoting *United States v. Prater*, 32 M.J. 433, 436 (C.M.A.1991)). The factual predicate for a guilty plea is sufficiently established if " 'the factual circumstances as revealed by the accused himself objectively support that plea....' " *United States v. Faircloth*, 45 M.J. 172, 174 (C.A.A.F.1996)(quoting *United States v. Dav-*

*enport,* 9 M.J. 364, 367 (C.M.A.1980)). In light of the appellant's guilty plea, this issue "must be analyzed in terms of the providence of his plea, not sufficiency of the evidence." *Id.*

The elements of involuntary manslaughter are:

(i) That a certain named or described person is dead;

(ii) That the death resulted from the act or omission of the accused;

(iii) That the killing was unlawful; and

(iv) That this act or omission of the accused constituted culpable negligence.

MANUAL FOR COURTS-MARTIAL, UNITED STATES (2002 ed.), Part IV, ¶ 44b(2). Culpable negligence is defined as "a negligent act or omission accompanied by a culpable disregard for the foreseeable consequences to others of that act or omission." *Id.* at ¶ 44c(2)(a)(i); *see also United States v. Oxendine,* 55 M.J. 323, 325 (C.A.A.F.2001). This means that the " 'basis of a charge of involuntary manslaughter may be a negligent act or omission which, when viewed in the light of human experience, might foreseeably result in the death of another.' " *Id.* (quoting MCM, PART IV, ¶ 44c(2)(a)(i)). "Acts which may amount to culpable negligence include ... pointing a pistol in jest at another and pulling the trigger, believing, but without taking reasonable precautions to ascertain, that it would not be dangerous[.]" MCM, PART IV, ¶ 44c(2)(a)(i). The test for foreseeability is " 'whether a reasonable person, in view of all the circumstances, would have realized the substantial and unjustifiable danger created by his acts.' " *Oxendine,* 55 M.J. at 325 (quoting *United States v. Henderson,* 23 M.J. 77, 80 (C.M.A.1986)).

Our superior court has held that "[t]o be proximate, an act need not be the sole cause of death, nor must it be the immediate cause—the latest in time and space preceding the death. But a contributing cause is deemed proximate only if it plays a material role in the victim's [death]." *United States v. Cooke,* 18 M.J. 152, 154 (C.M.A.1984). More specifically, our superior court has explained:

Even though the defendant was criminally negligent in his conduct it is possible for negligence of the deceased or another to intervene between his conduct and the fatal result in such a manner as to constitute a superseding cause, completely eliminating the defendant from the field of causation. This is true only in situations in which the second act of negligence *looms so large* in comparison with the first, that the first is not to be regarded as *a substantial factor* in the final result....

*United States v. Taylor,* 44 M.J. 254, 257 (C.A.A.F.1996) (quoting *Cooke,* 18 M.J. at 154 (citations omitted))(emphasis in original).

Our sister courts have each resolved the proximate cause issue raised by the appellant *sub judice* in similar fashion. In *United States v. Gomez,* 15 M.J. 954 (A.C.M.R.1983), the accused was convicted of premeditated murder after a contested trial before members. Gomez found the victim in bed with Gomez's estranged wife, and bludgeoned his head with a hammer. After undergoing surgeries to repair his fractured skull and reduce intracranial swelling, the victim was determined to be "brain dead" by four physicians. The victim's family decided to discontinue life support, and the victim died within eight minutes. Although there was no allegation that the medical care received by the victim was in any way negligent, the Army Court of Military Review in dicta considered what role negligence may have in conjunction with a claim that a victim's removal from life support may sever the chain of causation:

The principle we adopt is that where an accused intentionally inflicts a wound clearly calculated to endanger or destroy life, it is not a defense to a charge of homicide that the victim's death was contributed to by the negligence of the attending physician. Before an accused can be relieved of the consequences of his acts, the treatment of the attending physicians must rise to the level of gross negligence of such a nature as to turn aside the course of probable recovery. *State v. Shaffer,* 223 Kan. 244, 574 P.2d 205 (1977).

. . . .

... It is enough that the accused's act in bludgeoning the victim was a contributing

factor which, in conjunction with the *reasonable subsequent acts of the physicians in not continuing the life support system,* proximately caused the death.

*Id.* at 961 & n. 6 (emphasis added).

In *United States v. Stanley,* 60 M.J. 622 (A.F.Ct.Crim.App.2004), the accused was convicted of involuntary manslaughter in a contested case before a military judge alone. Stanley violently shook his six-week-old son Timothy to the extent that the child suffered severe brain damage requiring his placement on life support, to include a ventilator and artificial hydration and nourishment. After the child was removed from life support he was able to breathe on his own, but died eight days later. At trial and on appeal, Stanley argued that the withdrawal of artificially administered hydration and nourishment was a superseding intervening cause relieving him of criminal liability for the involuntary manslaughter of his son. *Id.* at 624. The Air Force Court of Criminal Appeals held that Stanley's wrongful acts were the proximate cause of his son's death:

> An accused is not shielded from manslaughter charges when artificially administered nutrition and hydration are withdrawn as part of a foreseeable, well-reasoned medical decision based upon what is considered of greatest benefit to the victim. In this case, the removal of artificially administered hydration and nutrition was *a reasonable response to a situation created solely by the appellant.* The decision to withdraw artificially administered sustenance while Timothy was in a persistent vegetative state did not "loom so large" as to relieve the appellant from criminal liability. When the appellant brutally shook his son, he *set in motion an unbroken, foreseeable chain of events.*

*Id.* at 628 (emphasis added).

*Analysis*

Similar to our Air Force brethren in *Stanley,* our analysis focuses on the concepts of foreseeability and intervening causes in the context of LCpl Oldroyd's death. The appellant does not dispute that he was culpably negligent when he unintentionally shot LCpl Oldroyd in the head with his 9mm service pistol, and that LCpl Oldroyd suffered a severe injury to his brain as a result. Moreover, there is no dispute that the medical care LCpl Oldroyd received was reasonable under the circumstances, and the appellant does not claim that LCpl Oldroyd's death was caused by any medical malpractice.

The appellant does dispute that LCpl Oldroyd's condition was deteriorating in the days leading up to his death, and claims that termination of life support was premature. He attempts to distinguish this case from *Stanley* on the premise that LCpl Oldroyd was not in a vegetative state, that he could have made a partial recovery, that "even Dr. Rosenbaum expressed optimism that LCpl Oldroyd's condition was improving," and that it is speculative whether LCpl Oldroyd would have succumbed to ARDS. Appellant's Brief at 7. For these reasons the appellant concludes, "Ultimately, taking LCpl Oldroyd off his life support was the cause of his death." *Id.* We disagree and believe that the appellant misconstrues the record.

The record shows, as the military judge found and the trial defense counsel recognized, that LCpl Oldroyd's condition was growing worse by the day, and that his death was in fact imminent. LCpl Oldroyd had suffered a severe injury to his brain and secondary injury caused by swelling to his brain. As a result of these injuries, his lungs began to fill with fluid, his kidneys began to fail, and his body temperature increased. As Dr. Rosenbaum stated,

> ... [T]he ARDS in his lungs ... that was really the biggest issue. We were having trouble ventilating him. There was always the possibility that he's going into multi-organ system failure. And when one organ system starts to have trouble, the next may follow. And his temperature was elevating. And there's always a risk of infection. So, yes, Scott was struggling. He was having some trouble. And so were there other things going on? Sure, there really were.

Record at 90–91. It is beyond dispute that LCpl Oldroyd's medical condition was a direct result of the gunshot wound to his brain caused by the appellant, and that but for the

appellant's culpable negligence, LCpl Oldroyd would not have been placed on life support and afflicted with ARDS in the first place. The appellant produced no evidence at trial or on appeal that demonstrates LCpl Oldroyd's death was caused by anything other than the foreseeable consequences of being shot in the head by the appellant. We conclude that LCpl Oldroyd's death was a foreseeable and direct result of the appellant's culpable negligence.

As for the decision of LCpl Oldroyd's family to remove him from life support, the record is clear that their difficult decision was made from their desire to alleviate LCpl Oldroyd's suffering, and with due consideration of his poor prognosis for survival. We find that their decision was reasonably foreseeable given the severe injury suffered by LCpl Oldroyd, and other deleterious effects his brain injury had on his body.

To relieve the appellant of criminal liability, the decision of LCpl Oldroyd's family to discontinue life support must not only have been a contributing factor in his death, but also a substantial or material factor that "loomed so large" as to excuse the appellant's culpably negligent act of shooting him in the head. *Stanley*, 60 M.J. at 628 (citing *Taylor*, 44 M.J. at 257). As a general rule, when life support is removed, the cause of death is not the removal, but whatever agency generated the need for life support in the first instance. *State v. Pelham*, 176 N.J. 448, 824 A.2d 1082 (2003)(citing *State v. Yates*, 64 Wash.App. 345, 824 P.2d 519 (1992)); *accord State v. Patterson*, 367 S.C. 219, 625 S.E.2d 239 (2006). We hold that the family's decision to discontinue the victim's life support did not constitute an independent intervening cause of his death as a matter of law.

■■■ We adopt the holding of the *Stanley* court that an accused is not shielded from a voluntary manslaughter charge when artificially administered ventilation is withdrawn as part of a foreseeable, well-reasoned medical decision based upon what is considered of greatest benefit to the victim. 60 M.J. at 628. We also hold that removal of the victim from a respirator prior to brain death does not relieve an accused of criminal responsibility unless the decision by the physician, or in

this case the victim's legal representative, "was no more than simple negligence." *Gomez*, 15 M.J. at 961 n. 6 (citations omitted). We conclude that it is sufficient that the appellant's act of culpable negligence in shooting LCpl Oldroyd in the head with his service pistol was a substantial contributing factor which, in conjunction with the reasonable subsequent decision of LCpl Oldroyd's parents in not continuing life support, proximately caused the death. *Id.* For these reasons, we find that the appellant's plea of guilty to involuntary manslaughter was provident, and there was no legal or factual basis to overturn his plea. *Faircloth*, 45 M.J. at 174.

### Multiplicity and Unreasonable Multiplication of Charges

In his third assignment of error, the appellant asserts that his convictions for involuntary manslaughter and reckless endangerment were "unreasonably multiplicious." Appellant's Brief at 8. The two charges are not facially duplicative, and in light of the appellant's unconditional plea of guilty to both, any issue of multiplicity was forfeited. *United States v. Heryford*, 52 M.J. 265, 266 (C.A.A.F.2000); *United States v. Lloyd*, 46 M.J. 19, 20 (C.A.A.F.1997). However, multiplicity and unreasonable multiplication of charges are two distinct concepts. *United States v. Roderick*, 62 M.J. 425, 433 (C.A.A.F.2006)(citing *United States v. Quiroz*, 55 M.J. 334, 337 (C.A.A.F.2001)); *see also United States v. Balcarczyk*, 52 M.J. 809, 813 n. 7 (N.M.Ct.Crim.App.2000). Though somewhat ambiguously, the trial defense counsel identified the issue as an unreasonable multiplication of charges vice multiplicity, Record at 58, and that is the issue we will address.

■■■ The military judge found that the specification under Charge III (involuntary manslaughter) and Specification 2 of Charge IV (reckless endangerment) were not multiplicious for findings but were multiplicious for sentencing, and reduced the appellant's punitive exposure to the maximum punishment for involuntary manslaughter: confinement for ten years, reduction to pay grade E–1, total forfeitures, and a dishonorable dis-

charge. Record at 60. Assuming, without deciding, that the two offenses constituted an unreasonable multiplication of charges, the appellant suffered no material prejudice because the military judge consolidated the charges for sentencing purposes, which is a viable alternative to dismissal. *Roderick*, 62 M.J. at 433 (citing *Quiroz*, 55 M.J. at 339). As a result of the military judge's consolidation of the two offenses for sentencing, the appellant's punitive exposure was not unreasonably increased in any way. *United States v. Quiroz*, 57 M.J. 583, 586 (N.M.Ct.Crim. App.2002)(en banc), *aff'd*, 58 M.J. 183 (C.A.A.F.2003)(summary disposition).

### Conclusion

Accordingly, we affirm the findings and the sentence, as approved by the convening authority.

Senior Judge VOLLENWEIDER and Judge STOLASZ concur.